UNITED STATES of America,
et al., Plaintiffs,

v.

STATE STREET BANK AND TRUST CO., As Trustee for Junior Subordinated Secured PIK Notes, et al., Defendants

Adv. No. 01–4605(KJC)

United States Bankruptcy Court,
D. Delaware.

Signed October 15, 2014

---

Joseph J. Bodnar, Esq., Law Offices of Joseph J. Bodnar, 2101 North Harrison Street, Wilmington, DE, for Scott Cable Communications, Inc. and State Street Bank and Trust Company.

Karen Barris Bragman, Neil C. Gordon, Heather S. Michael, Arnall Golden Gregory LLP, 171 17th Street NW, Atlanta, GA, Kathleen M. Miller, Smith, Katzenstein & Jenkins LLP, 800 Delaware Avenue, Wilmington, DE, for Ronald I. Chorches, Chapter 7 Trustee of Scott Cable Communications, Inc.

Mary Caloway, Buchanan Ingersoll & Rooney PC, Kerri K. Mumford, Landis Rath & Cobb LLP, 919 North Market Street, Wilmington, DE, Abid Qureshi, Akin Gump Strauss Hauer & Feld, LLP, 590 Madison Avenue, New York, NY, for Scott Cable Communications, Inc.

Teresa K.D. Currier, Saul Ewing, 222 Delaware Ave Ste, Wilmington, DE,

Mitchell P. Hurley, Akin gump Strauss Hauer & Feld LLP, 590 Madison Avenue, New York, NY, for Scott Cable Communications, Inc.

Lydia D. Bottome, John V. Cardone, Heather L. Richtarcsik, Alan Martin Shapiro, Peter Sklarew, U.S. Department of Justice, Tax Division, Washington, DC, for United States of America.

Kevin J. Mangan, Francis A. Monaco, Jr., Womble Carlyle Sandridge & Rice, LLP, 222 Delaware Avenue, Wilmington, DE, for State Street Bank and Trust Company.

## OPINION [1]

### KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

Before the Court is an adversary complaint in which the United States of America, on behalf of the Internal Revenue Service (the "Government" or "IRS"), asks this Court to recharacterize or equitably subordinate certain secured notes issued in 1996 as part of a chapter 11 reorganization plan. The secured notes were issued to two classes of creditors and known as Series A Junior PIK Notes and Series B Junior PIK Notes. For the reasons that follow, the request to recharacterize the Series A Junior PIK Notes is denied, but the request to equitably subordinate the Series A Junior PIK Notes is granted. The requests to recharacterize or equitably subordinate the Series B Junior PIK Notes are both denied.

## I. BACKGROUND

Scott Cable Communications, Inc. (the "Debtor" or "Scott Cable" or the "Compa-

ny") filed a chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of Connecticut (Bridgeport) (the "Connecticut Bankruptcy Court") on October 1, 1998 (the "1998 Bankruptcy Case"). This 1998 Bankruptcy Case followed closely on the heels of a 1996 chapter 11 bankruptcy filing by Scott Cable and its affiliated holding companies in the United States Bankruptcy Court for the District of Delaware (the "1996 Bankruptcy Case").

The 1998 Bankruptcy Case included a prepackaged liquidation plan and contemplated a sale of substantially all of the Debtor's assets. On December 11, 1998, the Connecticut Bankruptcy Court denied confirmation of the prepackaged liquidation plan after determining that (i) the capital gains tax owing to the Internal Revenue Service as a result of the proposed sale (which was scheduled to occur post-confirmation) was an administrative expense claim; and (ii) that the principal purpose of the prepackaged plan was to avoid payment of taxes. *See In re Scott Cable Commc'n, Inc.*, 227 B.R. 596 (Bankr. D.Conn.1998).

On November 19, 1998, the Government filed an adversary complaint in the Connecticut Bankruptcy Court against State Street Bank & Trust Co., as Indenture Trustee to the holders of Junior Subordinated Secured PIK Notes (the "Junior PIK Notes"), seeking to disallow the Indenture Trustee's secured claim under Bankruptcy Code § 502(a) on the grounds of recharacterization or, in the alternative, equitable subordination.[2] In 2001, the

---

1. This Opinion constitutes the findings of fact and conclusions of law required by Fed. R.Bankr.P. 7052.

2. As explained in more detail below, the plan confirmed in the 1996 Bankruptcy Case pro-

vided for the distribution of secured Junior PIK Notes to certain creditors who had previously held only *unsecured* public subordinated debentures and unsecured junior subordinated notes in the 1996 Bankruptcy Case. U.S. Bank National Association ("U.S. Bank" or

Connecticut Bankruptcy Court transferred the adversary proceeding to the Delaware Bankruptcy Court. *United States v. State Street Bank and Trust Co. (In re Scott Cable Commc'n, Inc.)*, 263 B.R. 6 (Bankr. D.Conn.2001).

Some holders of the Junior PIK Notes moved to intervene as defendants in the adversary proceeding, including Media/Communications Partners, L.P., Chestnut Street Partners, Inc., Milk Street Partners, Inc., TA Investments, and Allstate Insurance Company.[3] Scott Cable also intervened as a defendant (*United States v. State Street Bank & Trust Co. (In re Scott Cable Commc'n, Inc.)*, 2002 WL 417013 (Bankr.D.Del Mar. 4, 2002)), but after the 1998 Bankruptcy Case was converted to a chapter 7 case, the chapter 7 trustee filed a motion to, among other things, substitute himself for the Debtor in the adversary proceeding and realign himself as a plaintiff. The chapter 7 trustee's motion was granted, in part, allowing the trustee to be realigned as a plaintiff in this litigation.

This adversary case has been in the hands of four judges and three courts in two jurisdictions. There have been years of discovery and countless motions. A bench trial was held, spanning approximately 34 days over the course of nine months. A lengthy post-trial briefing process and numerous post-trial motions fol-

lowed. The record is complete and this matter is ripe for adjudication.

## II. *JURISDICTION*

▮ This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and § 157(a). The Government's claims for recharacterization and equitable subordination of claims against the Debtor's bankruptcy estate are core matters pursuant to 28 U.S.C. § 157(b)(2)(B), the equitable subordination claim directly arises under Bankruptcy Code § 510(c), and both claims require this Court to determine the priority among entities asserting claims against a bankruptcy estate. Resolution of such claims by final order are integral to the objectives set by Congress when enacting the Bankruptcy Code.[4]

## III. *FINDINGS OF FACT*

### A. *The Leveraged Buyout of Scott Cable*

Scott Cable, founded by Jim Scott, was a multi-system cable operator ("MSO") that was publicly traded before it was acquired in a leveraged buyout ("LBO") in 1988. (Government Negotiated Facts, D.I. 739, ("Stip. Facts—Gov.") ¶ 1.)[5] In 1984, the federal government deregulated the rates that MSOs and other cable operators could charge their subscribers, which had been previously regulated at the local level. (Pl.

---

the "Indenture Trustee") is the successor to State Street Bank & Trust Co. as indenture trustee for the Junior PIK Notes.

**3.** The Indenture Trustee and the intervening defendants are referred to herein as the "Defendants."

**4.** If it is later determined that a final order or judgment by this Court in this matter is not consistent with Article III of the United States Constitution, then this Opinion and Order are submitted as proposed findings of fact and conclusions of law for the District Court to

consider in accordance with the District Court's Amended Standing Order of Reference dated February 29, 2012.

**5.** The Government's Negotiated Facts found at D.I. 739 (hereinafter, the "Stip. Facts—Gov.") includes the facts as negotiated between the Government and the Defendants prior to trial, modified to reflect the Court's rulings of May 10, 2007, on the Defendants' objections thereto that had been reserved in Joint Trial Exhibit A.

Ex. 114 at 1317.) The deregulation of these rates made MSOs like Scott Cable more enticing to investors.

One such investor was Steven Simmons ("Simmons"), owner and officer of Simmons Communications, Inc., an entity that acquired and operated cable television companies. Simmons sought to acquire underperforming MSOs, expecting to increase their value by offering a greater selection of programs, improving management and marketing, and increasing the customer base. (Stip. Facts—Gov. ¶¶ 21–23.) The capital that Simmons Communications used to acquire cable systems was supplied primarily by investment funds and institutional investors. (*Id.* at ¶ 24.)

On April 17, 1987, Simmons sent a letter about his interest in acquiring Scott Cable to Richard Churchill ("Churchill") of T.A. Associates. (Pl. Ex. 2 at 871.) T.A. Associates was a venture capital firm that invested in technology oriented companies and media or communications companies. (Tr. 10/27/06, D.I. 777 ("Tr. D.I. 777") at 8:21—9:3 (Churchill Test.)).[6] On June 4, 1987, Churchill sent a letter to Simmons containing a prospective term sheet for T.A. Associates' and Allstate Insurance Company's ("Allstate") commitment to provide $22.5 million for the acquisition of the stock of Scott Cable. (Def. Ex. 1.) The financing would be divided into two parts: $18 million to be invested in a junior subordinated note with an interest rate of 15

5/8%, and $4.5 million to be invested as equity through Class B non-voting stock. *Id.* The junior subordinated notes would be subordinate to all other debt raised as part of the LBO.

On September 25, 1987, Scott Cable filed a Proxy Statement with the Securities and Exchange Commission (the "SEC"), which provided notice that a Special Meeting of Shareholders was to be held on October 23, 1987, to consider and vote on a proposal to approve the Agreement and Plan of Merger, dated as of June 12, 1987, as amended (the "Merger Agreement"), pursuant to which Simmons Communications Merger Corp. ("SCM" or the "Merger Corp."), a Texas corporation formed for the purpose of acquiring Scott Cable, would be merged with and into Scott Cable. (Pl. Ex. 15 at 2.) The Proxy Statement provided that the transaction would be structured as a sale of stock, stating, in part, as follows:

> The Company's investment bankers had requested that bidders submit proposed definitive agreements and that the agreements be structured in such a way as to involve the sale of all the capital stock of the Company.
>
> . . . .
>
> After considering the prices, financing, compliance with the bidding process, timing, prospects for closing and all other relevant matters, the Board

---

**6.** The media/communications group at T.A. Associates eventually became a separate entity called T.A. Communications. (Tr. D.I. 777 at 9:10—9:12 (Churchill Test.)). Churchill was a general partner of T.A. Communications, which was a general partner of Media/Communications Partners, L.P. (*Id.* at 10:24-11:8). These entities raised funds from investors and then invested and managed those funds for the investors. (*Id.* at 11:14—11:20). Churchill and others who worked for T.A. Communications or Media/Communications Partners, L.P. invested their own monies in separate investment funds (such as T.A. Investors, Milk Street Partners, Inc., and Chestnut Street Partners, Inc.), which invested alongside Media/Communications Partners, L.P. (*Id.* at 11:17—13:12; 18:7—18:12). All of the foregoing entities may be collectively referred to herein as "MC Partners." Media/Communications Partners, L.P. and Allstate Insurance Company had prior experience investing in MSOs with Simmons Communications. (Stip. Facts—Gov. ¶¶ 24–25).

concluded that the terms of the Merger with SCM offered the alternative that was in the best interests of the Company's shareholders because the SCM bid offered more favorable terms, including a higher per share consideration for the shareholders, and that the Company should pursue the SCM offer. The proposal from the unsuccessful group involved structuring the transaction as an asset sale which, because of the taxes that would have been incurred by the Company upon the sale, would have resulted in less cash available for distribution to the Company's shareholders. After further negotiations with SCM involving the price and terms of the Merger, the Merger Agreement was executed on June 15, 1987.

(Pl. Ex. 15 at 12.)

The Proxy Statement stated that the debt of Scott Cable, post-merger, would be increased significantly, and "in order to generate sufficient funds to satisfy its obligations, including interest and principal payments, and to meet its working capital and capital expenditure requirements, the Company will have to improve its results of operations and cash flow significantly above historical levels." (*Id.* at 28.) The Proxy Statement also stated that the proposed financing included, among other sources, $18,000,000 in Junior Subordinate Notes and $4,500,000 of equity contributions, essentially identical to the proposed term sheet between Churchill and Simmons. (*Id.* at 25.)

In 1987, some bondholders of old Scott Cable, whose bonds were to be assumed by the new, post-merger Scott Cable, filed a lawsuit in the United States District Court for the Southern District of New York, 87 CIV 7369, seeking to enjoin the proposed merger/acquisition of Scott Cable, alleging, among other things, "if the merger is consummated, the immediate effect thereof will be to render Scott Cable insolvent, undercapitalized, or otherwise unable to pay the amount due and owing by Scott Cable to plaintiffs and others under the indenture and the debentures . . . ." (Stip. Facts—Gov.¶ 42.) The lawsuit was settled with a payment by Scott Cable to the bondholders, including payment of the bondholders' attorney fees and other professional fees associated with the lawsuit. (*Id.* at ¶ 43.) The lawsuit was dismissed with prejudice and no injunction was entered. (*Id.*)

The LBO was consummated on January 19, 1988, at which time Scott Cable was merged into Merger Corp which, subsequently, was renamed Scott Cable Communications, Inc. (Defendants' Negotiated and Agreed Facts, D.I. 713, "Stip. Facts—Def.," ¶ 3.)[7] The financing for the merger transaction involved approximately $4.5 million of securities issued in the form of stock, and several tranches of securities issued in the form of debt instruments. (Stip. Facts—Gov.¶ 63.) The debt securities, in the approximate amounts and order of priority, were as follows:

---

**7.** The Defendants' Negotiated and Agreed Facts, docketed at D.I. 713 (hereinafter, the "Stip. Facts-Def.") were negotiated between the Government and the Defendants and moved into evidence without objection on February 23, 2007.

| | |
|---|---|
| Senior Bank Revolving Credit Agreement | $ 56,767,000 [8] |
| Series A Zero Coupon Senior Secured Notes due 1/31/93 | $ 23,000,000 |
| Series B Zero Coupon Senior Secured Notes due 1/31/93 | $ 7,000,000 |
| Series C Zero Coupon Senior Secured Notes due 1/31/93 | $ 3,000,000 |
| Series D Senior Secured Notes due 1/31/93 | $ 14,000,000 |
| Senior Subordinated Zero Coupon Notes due 7/31/93 | $ 8,000,000 |
| Zero Coupon Note due 8/15/93 | $ 5,000,000 [9] |
| Subordinated Debentures due 4/15/01 | $ 50,000,000 [10] |
| Junior Subordinated Notes due 12/31/95 | $ 18,000,000 |
| | $184,767,000 |

[**Editor's Note:** The preceding image contains the references for footnotes [8, 9, 10]].

(Stip. Facts—Gov. ¶ 64; Stip. Facts—Def. ¶ 4.) A security agreement providing a first priority lien on all assets of Scott Cable was provided to the Banks and to the holders of the Series A, B, C, and D Zero Coupon Senior Secured Notes.[11] (Stip. Facts—Gov.¶ 67.) Another security agreement providing a second priority lien on all assets of Scott Cable was provided to the Senior Subordinated Zero Coupon Notes due 7/31/93.[12] (*Id.*) The remaining notes issued in 1988 were unsecured. (Stip. Facts—Gov. ¶ 70).

Post-merger, the stock of Scott Cable was owned by six intermediate holding companies: Simmons Communications U.S., Inc.; Simmons Communications of Texas, Inc.; Simmons Communications Central, Inc.; Simmons Communications East, Inc.; Simmons Communications West, Inc.; and Simmons Communications South, Inc. (together the "Holding Companies").[13] (Pl. Ex. 160; Stip. Facts—Def. ¶ 34.) The Holding Companies, in turn, were wholly owned by Simmons Communications Texas Acquisition Corporation ("Acquisition Corp."). (Pl. Ex. 160; Stip. Facts—Def. ¶ 35.) The Class A common stock of Acquisition Corp. was held by

---

8. The senior secured Revolving Credit Agreement dated as of January 19, 1988 (the "Bank Loan" or the "Revolver") among Scott Cable and Canadian Imperial Bank of Commerce, individually and as agent for a syndicate of three banks (collectively, the "Banks") provided for total advances not to exceed

9. This unsecured Zero Coupon Note was payable to Scott Cable's former owner, Jim Scott (the "Scott Note").

10. The Subordinated Debentures due 4/15/01, refers to the 12 1/4 % Public Subordinated Debentures due 4/15/01, and were issued pursuant to an indenture dated March 15, 1986 (the "Public Debentures"). The Public Debentures were not obtained to finance the 1988 L BO, but were assumed by the new, post-merger Scott Cable (Stip. Facts—Gov. ¶ 64; Stip. Facts—Def. ¶ 10, ¶ 13.) The Public Debentures were publicly tradable. (Stip. Facts—Def. ¶ 11.)

11. The Series A, B, C, and D Senior Secured Notes (the "Senior Secured Notes") were issued pursuant to the senior secured Note Agreements dated as of January 20, 1988 between Scott Cable and CIG & Co., MONY Life Insurance Company of America ("MONY"), The Mutual Life Insurance Company of New York ("Mutual of New York"), and New England Mutual Life Insurance Company (collectively, the "Insurance Companies").

12. The Senior Subordinated Zero Coupon Notes due 7/31/93 (the "Senior Subordinated Notes") were issued to MONY and Mutual of New York.

13. The stock of Scott Cable held by the Holding Companies was pledged as further security to the collateral agent, State Street Bank & Trust Company of Connecticut, National Association, for both the Senior Secured Notes and the Senior Subordinated Notes. (Stip. Facts—Gov.¶ 69.)

Simmons Communications, which represented 100% of Acquisition Corp.'s voting stock. (Stip. Facts—Def. ¶ 38). In return for the investment of approximately $4,500,000, Allstate and MC Partners received non-voting Class B stock in Acquisition Corp. (Stip. Facts—Def. ¶ 36, ¶ 37.)

Because the LBO was structured as a stock purchase, and not an asset purchase, post-LBO Scott Cable inherited an adjusted tax basis in the assets of old Scott Cable that had been reduced to take into account depreciation deductions that had been claimed previously. (Stip. Facts—

Gov. ¶ 86.) If the assets were sold subsequently at a price in excess of the adjusted tax basis, the sale would produce a taxable gain. (*Id.* at ¶ 87.)

## B. *Terms of the 1988 Junior Subordinated Notes*

As was originally proposed in the term sheet between Churchill and Simmons, the Junior Subordinated Notes issued in 1988 (the "1988 Junior Notes") had an aggregate principal value of $18 million, received from the following purchasers:

| Purchaser | Note Amount |
|---|---|
| MC Partners | $10,440,000 |
| Allstate | $6,000,000 |
| Chestnut Street | $500,000 |
| TA Investors | $480,000 |
| NE Ventures | $400,000 |
| Milk Street | $180,000 |

(the "Junior Noteholders").[14] (Stip. Facts—Gov.¶ 81.) The 1988 Junior Notes had a maturity date of December 31, 1995, and a fixed interest rate of 10%. (Stip. Facts—Def. ¶ 26.) Payment of interest was deferred until the maturity date. On each anniversary of the issuance of the 1988 Junior Notes, all accrued interest was added to the principal amount of the notes. (Stip. Facts—Gov. ¶ 71, ¶ 73; Pl. Ex. 26 at CT0074.) The 1988 Junior Notes also contained a contingent interest feature, providing for an additional payment on the notes' maturity date based on a percentage of the increase in fair market value of Scott Cable, if any, above a certain floor,

but capped at a certain amount. (Stip. Facts—Gov. ¶ 77; Pl. Ex. 26 at CT0074). The 1988 Junior Notes were the most junior note instruments, expressly subordinated to all other notes, and, therefore, bore the greatest risk of repayment among the debt instruments issued by Scott Cable. (Stip. Facts—Gov. ¶ 75.)

The Junior Subordinated Note Purchase Agreement dated January 19, 1988 between Scott Cable and the Junior Noteholders (Pl. Ex. 26) (the "Junior Note Agreement") placed certain restrictions upon Scott Cable. For example, the Junior Note Agreement restricted Scott Cable's ability to incur future debt, future

14. The "Junior Noteholders" refers to the holders of the 1988 Junior Notes and the 1993 Junior Notes (defined *infra*.).

liens on its property, or future contingent liabilities. (Stip. Facts—Def. ¶ 17—¶ 19.) The Junior Note Agreement also restricted Scott Cable's ability to (i) make investments, loans and advances; (ii) enter into any transaction of merger, acquisition or consolidation; (iii) liquidate, sell, convey, lease, trade, exchange, or otherwise dispose of its assets or business; or (iv) enter into certain transactions with any officer, director or shareholder. (*Id.* at ¶ 20-¶ 22.) The Junior Notes Agreement also required Scott Cable to notify the Junior Noteholders if Scott Cable was in default under any other credit agreement for an amount in excess of $250,000. (*Id.* at ¶ 16.) The Agreement set forth fourteen "Events of Default." (*Id.* at ¶ 23.)

### C. *Management of Scott Cable*

On the same date that the LBO was completed (January 19, 1988), Scott Cable, its subsidiaries, and the Holding Companies entered into a Management Agreement with Simmons Cable TV Management, Inc. ("Simmons Management"). (Stip. Facts—Def. ¶ 40; Def. Ex. 3.) The Management Agreement provided that Simmons Management would be responsible for the day-to-day operations of all of the community antenna television systems (the "Systems") owned by Scott Cable, its subsidiaries, or the Holding Companies, including, without limitation, management of personnel, maintenance, fee collection, marketing, purchases of goods and services, and all policy decisions with respect to the operation of the Systems (including financial planning, establishing rates and prices, subscriber growth, advertising, programming, and representation before governmental or regulatory agencies). (Stip. Facts—Def. ¶¶ 41–42; Def. Ex. 3).

Post–LBO, none of the Junior Noteholders had any direct management oversight with respect to Scott Cable (Tr. 10/19/06, D.I. 760, ("Tr. D.I. 760") at 49:2–5 (Wade Test.)), nor did they hold any seats on Scott Cable's Board of Directors (Stip. Facts—Def. ¶ 43–¶ 44).

### D. *Performance of Scott Cable Post–LBO*

The exit strategy of the Junior Noteholders and Simmons Communications in acquiring Scott Cable was to increase the Company's cash flow (which they anticipated would lead to an increase in its fair market value), and liquidate their investment in four to eight years. (Stip. Facts—Gov. ¶ 94.) Post–LBO through 1992, Scott Cable experienced solid growth in system revenue and cash flow. (Pl. Ex. 114 at 1318.) Independent audits of Scott Cable performed by Deloitte & Touche, LLP ("Deloitte") confirmed a positive operating cash flow.[15] (Def. Exs. 34–40; Stip. Facts—Def. ¶¶ 49–50.) Further, on June 1, 1989, Scott Cable sold cable television systems in King City and Greenfield, California for approximately $8.5 million and, on April 30, 1992, Scott sold its San Angelo and Andrews cable television systems for aggregate net proceeds of $53.7 million. (the "Post–LBO System Sales"). Scott Cable used the sale proceeds to reduce its secured debt. (Stip. Facts—Def. ¶ 46—¶ 48.)

However, changes in regulations related to the banking and cable industries reduced cable company values and thwarted the investors' goal. In 1989, the Comptroller of the Currency instituted changes in regulations adversely affecting "highly leveraged transactions." (Pl. Ex. 114 at 1317.) Because financing in the cable industry tended to be highly leveraged, the

**15.** In the Deloitte audits, the Junior Notes were always considered debt and included in "Notes and Loans Payable" on the balance sheet. (Stip. Facts—Def. ¶ 45.)

regulatory changes created a credit crunch for the cable industry, which, in turn, led to a decline in the value of cable systems. (*Id.*; Stip. Facts—Gov. ¶ 111). Also, beginning in 1990, the market for small cable systems began to suffer under the threat of a return to federal regulation of cable subscriber rates. (Pl Ex. 114 at 1317; Stip. Facts—Def. ¶ 52.) In 1992, Congress enacted the Cable Television Consumer Protection and Competition Act of 1992 (the "1992 Cable Act"), restricting the rates cable companies could charge and leading to a decrease in the prices at which cable systems were bought and sold. (Def. Neg ¶ 53.) Beginning in March 1993, cable operators were effectively required to freeze their subscriber rates, followed by rate reductions in September 1993 and, again, in August 1994. (*Id.*)

The managers overseeing MC Partners' and Allstate's investments in Scott Cable maintained open and regular communications with Scott Cable about the Company's financial condition and performance. (Stip. Facts—Gov. ¶ 96—¶ 102.) Internal memoranda and testimony of representatives of MC Partners and Allstate show that the Junior Noteholders were concerned about a decrease in the value of Scott Cable. (Stip. Facts—Gov. ¶ 120—¶ 125; ¶ 130—¶ 133.) In July 1990, Simmons noted in a letter to Allstate that the Public Debentures were trading at the reduced price of approximately $.60 on the dollar and proposed that Scott Cable buy back the Public Debentures to reduce in-terest payments and total outstanding debt. (Stip. Facts—Gov. ¶ 113—¶ 116.) However, Scott Cable did not purchase the Public Debentures. (Stip. Facts—Gov. ¶ 118.)

As concern mounted over the Company's ability to pay its debt instruments that were due to mature in 1993, Scott Cable hired First Boston Corporation, an investment banking company, to assist in developing strategies to meet the Company's obligations, either through a sale of assets or refinancing. (Stip. Facts—Gov. ¶ 119—¶ 120, ¶ 126.) Simmons and the Junior Noteholders recognized that the first option—a sale of Scott Cable's assets—would not generate sufficient funds to pay the 1988 Junior Notes. In a report issued in October 1991, First Boston noted that the value of Scott Cable's assets might be sufficient to pay senior debt, but not to pay the Public Debentures and original equity, including the 1988 Junior Notes, which were listed in the report under the category of "Total Equity and Equivalents." (Stip. Facts—Gov. ¶ 146, ¶ 150—¶ 152.) An internal Allstate memo dated October 11, 1991 reached the same conclusion. (Stip. Facts—Gov. ¶ 128—¶ 133.)

The First Boston report also discussed that "[t]axes will have to be paid on any gain from asset sales with the amount dependent upon the Company's use of the mirror subsidiaries, the relevant stock or assets bases and the amount of existing NOLs." [16] (Stip. Facts—Gov. ¶ 153; Pl

---

16. Simmons and the Junior Noteholders had considered that prospective buyers might want to purchase Systems that were located in close proximity to each other. To provide for future sales of geographically clustered assets in transactions that would constitute stock sales, the Scott Cable LBO was structured using layers of corporations, including holding or "mirror" corporations, that could be used for those future sales. (Stip. Facts—Gov. ¶ 162—¶ 165.) Under a mirror corpora-tion transaction, a portion of Scott Cable's assets could be transferred to a holding or mirror corporation so that the stock of the mirror corporation could be sold to the buyer. (*Id.* at ¶ 167.) Later internal discussions by MC Partners' managers expressed concerns that any transfer of assets made when Scott Cable was insolvent could be subject to tax treatment by the IRS as an asset sale and deferred inter-company taxable gain under Section 332 of the Internal Revenue Code.

Ex. 35 at MC 09193.) Because Scott Cable had used the majority of its existing net operating losses ("NOLs") to offset the gains received from the Post–LBO System Sales, additional asset sales would create significant tax liabilities. (Stip. Facts—Gov. ¶ 202; Pl. Ex. 50 at A011210.) As discussions continued through 1992, Simmons, MC Partners and Allstate understood that, due to depressed cable system values and potential capital gains tax liability, a sale of Scott Cable's assets would be insufficient to pay the 1988 Junior Notes. (Stip. Facts—Gov. ¶ 211–¶ 214.)

The October 1991 First Boston report also discussed the option of a restructuring in which the equity holders would purchase the Public Debentures and/or the Scott Note at a discount. (Stip. Facts—Gov. ¶ 149.) Notes of internal discussions at MC Partners over a purchase of the Scott Note reflected concerns that the Public Debenture Holders might seek to equitably subordinate any payment of the Scott Note to the Public Debentures, or senior lenders might seek to require the Junior Noteholders to make an equity infusion, rather than purchase the Scott Note. (*Id.* at ¶ 156—¶ 157, ¶ 179—¶ 180.) In a May 1992 report, First Boston proposed "that all existing lenders and investors participate in an intermediate term recapitalization which will allow [the Company] to reduce leverage and better position itself for refinancing or sale at the end of 1995." (Pl Ex. 50 at A011207.) Subsequent discussions among First Boston, Simmons and the Junior Noteholders again proposed that the Junior Noteholders purchase the Scott Note due to concerns that, under the intercreditor agreement, Scott could block interest payments

to the Public Debentures and "bring the house of cards down." (Stip. Facts—Gov. ¶ 189—194.) Moreover, a default on the Scott Note would trigger cross-defaults on the Public Debentures and, indirectly, in certain senior secured notes. (*Id.* at ¶ 229; Pl. Ex. 58 at A011405.)

MC Partners, Allstate and the management of Scott Cable determined that Scott Cable should remain as a going concern in the hope that, over the course of two or three years, cable system values would appreciate and a later refinancing or liquidation would provide a favorable recovery. (*Id.* at ¶ 215). In an internal memo dated June 17, 1993, prepared for the Allstate Venture Capital Division, Richard Doppelt (an Allstate investment manager) noted that Allstate had no choice but to agree to a recapitalization plan involving an extension of the maturity date for the 1988 Junior Notes and committing additional funds to purchase the Scott Note; otherwise, Allstate risked losing its investment. (*Id.* at ¶ 245—¶ 251.) Likewise, MC Partners' goal during the 1993 restructuring was "to do the minimum amount necessary to keep senior lenders at bay in hopes that, as market conditions improved ... over the next couple of years, that would enable us to then refinance" remaining debt without the need for additional asset sales or liquidating the company. (*Id.* at ¶ 259 quoting Churchill Dep. at 157.)

E. *The 1993 Restructuring of Scott Cable*

On or about June 30, 1993, Scott Cable entered into a series of agreements to restructure Scott Cable's finances (the "1993 Restructuring"). As part of the

---

(*Id.* at ¶ 170.) Further, the internal discussions also raised concerns of potential personal liability for Scott Cable's officers and directors if the company was deemed to be insolvent and the officers and directors allowed payment of creditors instead of federal taxes. (*Id.* at ¶ 171). A mirror corporation transaction was never executed by Scott Cable. (*Id.* at ¶ 177).

1993 Restructuring, the maturity dates on the Bank Loan and the Senior Secured Notes were extended until November 15, 1995, and the maturity dates on the Senior Subordinated Notes were extended until January 15, 1996. (Stip. Facts—Def. ¶ 55.) The Junior Noteholders and Simmons Communications purchased a portion of the Scott Note. (Pl. Ex. 69 at 2074.) Sandler Capital Management ("Sandler Capital"), a holder of a portion of the Public Debentures, also purchased a portion of Scott Note. (Pl. Ex. 100 at 2.)

The Junior Note Agreement was also amended. (Pl. Ex. 70.) The amendment extended the maturity date of the 1988 Junior Notes to November 15, 2003. (Stip. Facts—Def. ¶ 55.) Scott Cable replaced the 1988 Junior Notes with Junior Subordinated Notes Due 2003 (the "1993 Junior Notes") in the aggregate principal amount of $30,285,640.55, which reflected the original principal amount due to the Junior Noteholders and accrued interest due under the terms of the 1988 Junior Notes. No cash interest was paid on the 1988 Junior Notes. (Stip. Facts—Gov. ¶ 265.) No new money was required to be paid by holders of the 1988 Junior Notes for the 1993 Junior Notes. (Stip. Facts—Gov. ¶ 266.)

The Junior Noteholders also entered into a "Voting Agreement" with the Banks and the Senior Secured Noteholders dated June 30, 1993, which provided that if Scott Cable subsequently filed bankruptcy, the Junior Noteholders would vote only in favor of a proposed plan of reorganization that the Banks and the Senior Secured Noteholders favored. (Stip. Facts—Def. ¶ 59—¶ 60.) Otherwise, the Junior Noteholders were required to vote against any proposed plan of reorganization to which the Banks and Senior Secured Noteholders were opposed. (*Id.*). The Junior Noteholders entered into a similar Voting Agreement with the Subordinated Secured Noteholders. (*Id.* at ¶ 61.)

### F. The 1993 Management Incentive Agreement; Management Transition

During the time leading up to the 1993 Restructuring, Simmons suggested the possibility of SCC Management entering into an incentive agreement with the Junior Noteholders. (Tr. 10/30/06, D.I. 778, 139:21–24 (Churchill Test.) ("Tr. D.I. 778").) On June 30, 1993, the same date the Junior Note Agreement was amended, the Junior Noteholders and Simmons Management entered into a management incentive agreement (the "1993 Management Incentive Agreement") pursuant to which the Junior Noteholders granted Simmons Management a portion of any recovery obtained on the 1993 Junior Notes. (Stip. Facts—Def. ¶ 67; Pl Ex. 68.) When negotiating the 1993 Management Incentive Agreement, the parties had no discussions about granting a security interest to the Junior Noteholders. (Tr. D.I. 778 at 139:25–140:8.) Rather, the agreement states that it was created because "the parties desire to provide for an incentive to the Manager to enhance the value of the cable television systems owned by Scott [Cable]." (Pl. Ex. 68 A0001; Stip. Facts—Def. ¶ 68.)

In November 1993, Simmons, who was the chief executive officer ("CEO"), chairman and a director of Scott Cable, as well as the president, CEO, and a director of Simmons Management, decided to retire. (Tr. D.I. 778 at 140:9–25; Pl Ex. 74.) Bruce Armstrong ("Armstrong"), who was then a director, president and chief operating officer of Scott Cable, was selected to be the new CEO, chairman and president of Scott Cable, and the new president and CEO of Simmons Management, with the approval of the Banks, Senior Secured

Noteholders, and Senior Subordinated Noteholders.[17] (Pl. Ex. 74; Stip. Facts—Def. ¶ 72.) The Junior Noteholders also approved the replacement of Simmons with Armstrong, as required by the Junior Note Agreement. (Stip. Facts—Gov. ¶ 282A.)

Armstrong and Simmons entered into an agreement in which Simmons transferred his interests in Simmons Communications and Scott Cable to Armstrong.[18] (Stip. Facts—Gov. ¶ 283; Pl. Ex. 75.) The 1993 Management Incentive Agreement was amended to provide that Armstrong and Simmons would each receive a portion of any recovery on the 1993 Junior Notes. (Stip. Facts—Gov. ¶ 286; Pl. Ex. 76.) The transition was effective on January 31, 1994. (Stip. Facts—Def. ¶ 73.)

G. *Efforts to Sell and Further Restructure Scott Cable post–1993 Restructuring*

In September 1994, Armstrong hired HPC Puckett & Company ("HPC"), a cable television broker, to find a buyer for Scott Cable. (Stip. Facts—Gov. ¶ 295; Pl. Ex. 89 at 8238.) In a report dated January 26, 1995, H PC advised that it had entered into confidentiality agreements with 10 prospective purchasers and provided details of its discussions with a few of those MSOs about a potential stock purchase, merger, or other business venture with Scott Cable. (Stip. Facts—Gov. ¶¶ 299; Pl. Ex. 79 at 11121, 11126, 11181.) However, a pattern developed in which any potential buyers' interests waned after learning about the geographic spread of the systems and the low tax basis in the assets. (Pl. Ex. 89 at SCCB 8238.) For example, one operator, Classic Cable, initially offered to purchase Scott Cable for $120 million; but, after a more complete understanding of Scott Cable's tax situation, Classic Cable lowered its offer to $95 million. (Stip. Facts—Gov. ¶ 300—¶ 302; Pl. Ex. 89 at SCCB 8238.) Other offers were made in the range of $95–$100 million, but with a debt load of $148 million, the offers would result in no return to Junior Noteholders and an impaired return to Public Debenture Holders, and were rejected. (Pl. Ex. 89 at SCCB 8239.)

Scott Cable sold off separate cable systems to enable it to make principal payments to the Banks and the Insurance Companies, as required by the 1993 Restructuring. (Stip. Facts—Def. ¶ 75; Pl. Ex. 114 at 1318.) In January 1994, Scott Cable sold its cable system in Rancho Cucamonga, California for approximately $23 million. (Stip. Facts—Def. ¶ 75.) In February 1995, Scott Cable sold certain cable systems in Texas, Oklahoma and Missouri for $12.7 million. (*Id.* at ¶ 76.) The proceeds of those sales resulted in $33 million in principal payments to the Banks and Insurance Companies. (*Id.*)

As a result of the 1993 Restructuring, the Bank Loans and Senior Secured Notes were scheduled to mature on November 15, 1995, and the Senior Subordinated Notes were scheduled to mature on January 15, 1996. (*Id.* at ¶ 78.) By Spring 1995, Scott Cable had no potential buyer for the Company as a whole. Around that time, Armstrong was discussing potential tax consequences of a sale with the secured creditor of a different cable company. The secured creditor told Armstrong

---

17. Simmons Management was renamed Scott Cable Management Company, Inc.("Scott Management") (Pl. Ex. 77 at 10346.)

18. Simmons Communications was renamed American Cable Entertainment (ACE). (Stip. Facts—Gov.¶ 287.) The Holding Companies were renamed ACE–U.S., Inc.; ACE–Texas, Inc.; ACE–Central, Inc.; ACE–East, Inc.; ACE–West, Inc.; and ACE–South, Inc. (Stip. Facts—Gov. ¶ 288; Pl. Ex. 114 at 1306.)

that, due to his secured status, he was not concerned about the tax consequences of a sale. (Tr. 10/25/06, D.I. 775, at 27:6–28:2 (Armstrong Test.).) Around May of 1995, Armstrong began to meet with attorneys Michael Blumenthal ("Blumenthal") and Stanley Bloch ("Bloch"), to discuss potential sales or a restructuring.[19] (Pl. Ex. 80.) At these meetings, the possibility of granting a security interest to the Public Debenture Holders and Junior Noteholders arose, and the attorneys began to research this issue as part of an overall restructuring. (Tr. 10/26/06, D.I. 776 ("Tr. D.I. 776") at 132:13–132:25 (Armstrong Test.); Bloch Dep. 3/10/04 at 264:23–265:16.) (See also Pl. Ex. 80 at SCP5724: "What we are trying to do is put the present creditors in a position of getting paid and avoiding income taxes on the sales from eating up a good part of the proceeds. Please note that because the assets have a very low basis the income taxes could be as high as an aggregate of about $50,000,000.") Bloch questioned whether granting a security interest to subordinated debt holders, thereby allowing them to be paid before taxes in the event of an asset sale, would result in the government pursing payment from Scott Cable's officers or management, individually. (Stip. Facts—Gov. ¶ 309; Bloch Dep. at 196:14—198:22.) Further research and discussions were held about whether granting a security interest in a chapter 11 bankruptcy case would resolve the personal liability issues. (Stip. Facts—Gov. ¶ 329, ¶ 335; Bloch Dep. at 199:12—200:10.) The attorneys' research at that time indicated that no personal liability for officers or directors should result from the granting of a lien in a chapter 11 reorganization. (Bloch Dep. at 268:6—268:25.)

On October 15, 1995, Scott Cable defaulted on an interest payment due to the Public Debenture Holders. (Stip. Facts—Gov. ¶ 338).

Scott Cable retained investment bankers Donaldson, Lufkin & Jenrette ("DLJ") as restructuring advisors. (Pl. Ex. 89 at SCCB 8239.) On November 2, 1995, Scott Cable met with its senior lenders and began negotiations to restructure and refinance the senior debt due to mature on the 15th of that month. (Pl. Ex. 93 at SCCB 8412.) The senior lenders agreed to a 90–day standstill agreement that postponed, until February 15, 1996, the lenders' exercise of their rights upon an event of default. (Id. at SCCB 8412.) The terms of the standstill agreement required Scott Cable: (1) to make a cash payment of $3 million; (2) to pay the previous quarter's interest in cash; (3) to pay, in cash and in advance, any interest that would be incurred during the standstill period; and (4) to obtain approval from senior lenders before paying any management fees during the standstill period. (Id.) The Junior Noteholders were not part of the negotiations and were told of the standstill agreement on November 8, 1995. (Id.) On November 15, 1995, with the standstill agreement in place, Scott Cable defaulted on its senior debt by failing to make the required payment. On November 16, 1995, Scott Cable notified the holders of the Public Debentures of the various defaults, the standstill agreement, and the Company's restructuring efforts. (Pl. Ex. 94; Stip. Facts—Gov. ¶ 371—¶ 372.)

Armstrong, Scott Cable's CEO, acknowledged that if the Company was liquidated in late 1995, the sale proceeds would be insufficient to pay all of the notes. (Stip. Facts—Gov. ¶ 410.) DLJ issued a report

---

19. Bloch was a director of Scott Cable at this time, but resigned on November 10, 1995, about three months prior to Scott Cable's initial bankruptcy filing. (Def. Ex. 187 Sched. 7.20.)

dated November 1995 (the "DLJ Report") that was provided to the unsecured noteholders. (Stip. Facts—Gov. ¶ 353.) In the report, DLJ estimated Scott Cable's value at $126.7 million, based upon a cash flow multiple of 8.5. (Pl Ex. 90 at SCCB 8045.) Using the same multiple, DLJ projected that Scott Cable's value would reach $210.8 million by 2000. (*Id.*) As a result, while a sale of Scott Cable in 1995 would not allow for full recovery to the unsecured noteholders, there was a potential for 100% recovery in 2000. (*Id.*) The DLJ Report proposed a restructuring plan that required: (i) raising $75 million new debt capital to refinance all secured debt and zero coupon subordinated notes; (ii) using excess cash to redeem partially the Public Debentures; and (iii) restructuring the balance of the Public Debentures and the 1993 Junior Notes as secured debt of a holding company of Scott Cable, with varying lien priorities. (*Id.* at SCCB 8021; Stip. Facts—Gov. ¶ 360.) *Discussion between DLJ and the Junior Noteholders about the November 1995 DLJ Report included a plan or strategy to provide a security interest in the assets of Scott Cable to Junior Noteholders to put them in a position to be paid before any capital gains tax that would result from a future sale of Scott Cable's assets.* (Stip. Facts— Gov. ¶ 404.)

### H. *Negotiations with the Public Debenture Holders*

An informal committee, consisting of the larger holders of the Public Debentures and Sandler Capital, which held a number of Public Debentures and a portion of the Unsecured Zero Coupon Notes (the "Informal Bondholders Committee"), was created to negotiate with Scott Cable.[20] (Pl.

Ex. 100 at 2; Stip. Facts—Gov. ¶ 375.) The Informal Bondholders Committee hired Brown & Wood as its legal counsel, and Chanin and Company as its financial advisor. (Stip. Facts—Gov. ¶ 376—¶ 377). Scott Cable proposed a restructuring plan as set forth in the DLJ Report. On January 25, 1996, the Informal Bondholders Committee responded by proposing (i) that the senior debt would be exchanged for $50 million senior secured notes having a first lien on Scott Cable's assets; (ii) Sandler Capital's share of the Unsecured Zero Coupon Notes would be exchanged for a proportional share of senior payment-in-kind ("PIK") notes, secured by a second lien on Scott Cable's assets; (iii) the Public Debentures would be exchanged for a share of the second lien secured senior PIK notes, 100% common stock of Scott Cable, and 75% of junior PIK notes, secured by a third lien on Scott Cable's assets; (iv) the 1993 Junior Notes would be exchanged for 25% of the third lien secured junior PIK notes; and (v) the restructuring would be accomplished through confirmation of a pre-packaged chapter 11 plan of reorganization. (Def. Ex. 90 at A000482; Pl. Ex. 100 at 3.)

On February 1, 1996, Scott Cable responded to the Informal Bondholders Committee's counter-proposal suggesting, among other things, changes to proposed interest rates and maturity dates. (Pl. Ex. 100, Att. C.) Scott Cable's response also proposed keeping Sandler Capital's interest in the Unsecured Zero Coupon Notes as part of the senior debt, granting second lien noteholders two of the five seats on the Board of Directors and the right to compel Scott Cable to sell after a period of four years. (*Id.* at 2.) On February 6, 1996, the Informal Bondholders Commit-

---

**20.** After the 1993 Restructuring, the Scott Note is referred to as the Unsecured Zero Coupon Notes.

tee responded to Scott Cable's proposal, rejecting some parts and revising others. (Def. Ex. 91.) However, Scott Cable and the Informal Bondholders Committee could not agree upon a restructuring plan prior to the expiration of the standstill agreement on February 15, 1996.

### I. Scott Cable's 1996 Bankruptcy Case

On February 14, 1996, Scott Cable and the Holding Companies, now named ACE—Central, Inc, ACE—East, Inc., ACE—South, Inc., ACE—Texas, Inc., ACE—U.S., Inc., and ACE—West, Inc., (collectively the "Debtors") filed chapter 11 bankruptcy petitions in the Delaware Bankruptcy Court (the "1996 Bankruptcy Case"). (Stip. Facts—Def. ¶ 85.) An Official Committee of Unsecured Creditors (the "Creditors Committee") was formed, consisting of Home Box Office and holders of the Public Debentures (some of whom had served on the Informal Bondholders Committee. (Pl. Ex. 199 ¶ 4 n. 1; Stip. Facts—Def. ¶ 90.)) No Junior Noteholder or representative thereof was a member of the Creditors Committee. (Stip. Facts—Def. ¶ 92.)

| | |
|---|---|
| Senior Secured Bank debt: | $ 8.3 million |
| Senior Secured Notes: | $ 23.1 million |
| Senior Subordinated Notes: | $ 17.6 million |
| Unsecured Zero Coupon Notes: | $ 13.3 million |
| Public Debentures: | $ 55.0 million |
| 1993 Junior Notes: | $ 38.9 million |
| Trade Debt: | $ 1.4 million |
| | $157.6 million |

(Pl. Ex. 114 at 1311–1314.) A letter dated April 19, 1996 from the Creditors Committee's counsel to the Committee's members attached a chart showing the enterprise value of Scott Cable falling within a range of $105 million to $142.5 million. (Stip. Facts—Gov. ¶ 419, Pl. Ex. 103.) With Court approval, Scott Cable retained Waller Capital Company ("Waller Capital") as appraisers to determine the fair market value of the Company. (Pl Ex. 114 at 1346.) Waller Capital determined that the fair market value of Scott Cable's cable television systems as of June 30, 1996 was $142,251,000.00 (Id.)

After filing its bankruptcy case, Scott Cable began a campaign to refinance certain existing indebtedness. (Pl. Ex. 114 at 1321.) Initially, Scott Cable sought $65 million to replace all of the secured debt and the Unsecured Zero Coupon Notes on the effective date of a plan of reorganization. (Id.) The remaining indebtedness, including the Public Debentures and 1993 Junior Notes, would be restructured in a plan of reorganization. (Id.) After receiving inquiries from seven financial institutions, Scott Cable began negotiations with two institutions that expressed a strong interest in providing refinancing. (Id. at 1322.) At the conclusion of the process, Scott Cable obtained a commitment letter from Finova Capital Corporation ("Finova") dated September 19, 1996, in which Finova agreed to provide Scott Cable with a term loan of $57.5 million and a revolving loan of $10 million, with a term of five years from the date of closing, secured by a first lien on all of the assets of reorganized Scott Cable and a lien on the New Common Stock of reorganized Scott Cable. (Id. at 1322–23.)

### J. Post-filing negotiations with the Creditors Committee

The Creditors Committee and the Debtors engaged in restructuring negotiations, following closely along the lines of the pre-

bankruptcy negotiations between the Informal Bondholders Committee and Scott Cable. (Def. Ex. 95.)

Around May of 1996, DLJ prepared a presentation discussing the competing proposals between the Creditors Committee and the Debtors, and a proposed cramdown scenario for the Debtors. (Def. Ex. 98.) Each of the proposals assumed 1999 as the exit year in which Scott Cable would be sold. (*Id.*) The recovery analysis under the Creditors Committee's proposal predicted no recovery for the 1993 Junior Noteholders in the event of a stock sale in 1999, and limited recovery in the event of an asset sale in 1999. (Def. Ex. 98.)

In a letter to Creditors Committee dated April 19, 1996, counsel to the Creditors Committee recommended the following:

.The equity and the holders of the [1993 Junior Notes] want to preserve any upside potential and are unwilling to eliminate any of their debt because to do so will only transfer value to the taxing authorities. In light of these facts and the real ability of both the Senior Lenders and the holders of the [1993 Junior Notes] to oppose confirmation, it appears that the best way to proceed is to propose a compromise plan that will give each group some of what it wants.

(Stip. Facts—Gov. ¶ 420; Pl Ex. 103 at 7.)

K. *Scott Cable's 1996 Plan and Disclosure Statement*

(1) *Plan Negotiations*

After receiving two extensions of the exclusive period in which only the Debtors can file a plan of reorganization and solicit acceptances, the Debtors filed a Disclosure Statement and Joint Plan of Reorganization on August 29, 1996 (the "Initial Plan"). (Pl. Ex. 109.) The cornerstone of the Initial Plan was the $67.5 million in refinancing provided by Finova, which would be used to pay the Senior Bank Loan, the Senior Secured Notes, the Senior Subordinated Notes, and the Unsecured Zero Coupon Notes in full on the plan's effective date. (Pl. Ex. 109 at 1477; Pl Ex. 115 at 2:21–2:24.) The Initial Plan provided that the Public Debenture Holders would receive restructured notes in the full amount of their allowed claims, secured by a second priority lien on Scott Cable's assets that was subordinate to the lien granted to Finova pursuant to the post-confirmation credit facility. (Pl. Ex. 109 at 1486.) The 1993 Junior Noteholders would receive restructured notes in the principal amount of $35 million, secured by a third priority lien on Scott Cable's assets that was subordinate to the liens granted to Finova and the Public Debenture Holders. (*Id.* at 1487.) The Initial Plan's treatment of the Public Debenture Holders and the 1993 Junior Noteholders was not consensual. (Tr. D.I. 778 at 165:12–165:20.)

Negotiations with the Creditors Committee intensified, not only between the Debtors and the Creditors Committee, but also between representatives of the 1993 Junior Noteholders and the Creditors Committee. (Pl. Ex. 114 at 1324; Tr. D.I. 778 at 165:17–165:20.) Points of negotiation included the Public Debenture Holders' requests for a current cash payment upon confirmation, input into post-confirmation corporate governance, and a deadline for the occurrence of a post-confirmation "transaction event" (such as a merger or sale of reorganized Scott Cable) (*Id.* 165:21–166:11). In addition, the Public Debenture Holders sought a share of the third priority secured notes to be issued post-confirmation to the 1993 Junior Noteholders. (*Id.* 166:16—167:4.)

(2) *The 1996 Plan and Disclosure Statement*

The parties reached an agreement that was reflected in the Debtors' First Amend-

ed Disclosure Statement and First Amended Joint Plan of Reorganization dated October 22, 1996. (Pl. Ex. 114 at 1324; Pl. Ex. 113.) On the same day that the hearing for approval of the Disclosure Statement was set, the Debtors filed the Second Amended Disclosure Statement (the "1996 Disclosure Statement") and Second Amended Joint Plan of Reorganization dated October 31, 1996 (the "1996 Plan") to incorporate comments received from secured lenders and, primarily, from the Creditors Committee. (Pl. Ex. 115 at 3:11—3:17.)

### (a) *Treatment of certain creditors*

The terms of the 1996 Plan provided that certain creditors would be treated as follows:

(1) all administrative claims, tax claims, priority claims, senior secured debt, subordinated secured debt, the Unsecured Zero Coupon Notes and "other" unsecured debt [21] would be paid in full on the plan's effective date with funds received from $67.5 million credit facility between Finova and reorganized Scott Cable that would be secured with a first priority lien on all of the assets of reorganized Scott Cable and all of the new common stock issued under the plan;

(2) each Public Debenture holder would receive:

(a) its share of (i) the Public Subordinated Interest Payment (i n the total amount of $5,087,153), (ii) the Public Subordinated Principal Payment (in the total amount of $500,000), and (i i i) the Public Subordinated Refinancing Fee (in the total amount of $500,000) in cash on the plan's effective date;

(b) a negotiable certificate representing each holders' share of its undivided interest in the New Restructured Second Secured PIK Notes (the "Senior PIK Notes") [22] and all of the New Class C Common Stock; and

(c) a negotiable certificate representing each holders' share of its undivided interest in fifteen percent of the New Restructured Third Secured PIK Notes.

(3) each 1993 Junior Noteholder would receive:

(a) a negotiable certificate representing each holders' share of its undivided interest in 85% of the New Restructured Third Secured PIK Notes (the "Junior PIK Notes"); [23] and

(b) its share of all New Class B Common Stock.

(Pl. Ex. 114 at 1306–07, 1327–31; 1385–87.)

The 1996 Disclosure Statement explains that no dividends are expected to be paid

---

21. "Other" unsecured claims included unsecured claims other than Class 5 (the Unsecured Zero Coupon Notes), Class 6 (the Public Debentures) and Class 7 (the 1993 Junior Noteholders).

22. The 1996 Plan described the terms of the Senior PIK Notes as (i) having an initial aggregate principal amount of $49.5 million; (ii) paying interest semi-annually through the issuance of additional Senior PIK Notes at the rate of 15% per annum on the unpaid principal balance; (iii) maturing five years and three months from the Effective Date, subject to acceleration upon the occurrence of certain events; and (iv) being secured by a lien on the assets of Scott Cable, subordinate to the lien

granted to Finova in the PostConfirmation Credit Facility. (Pl. Ex. 114 at 1377.)

23. The 1996 Plan described the terms of the Junior PIK Notes as (i) having an initial aggregate principal amount of $38,925,797; (ii) paying interest semi-annually through the issuance of additional Junior PIK Notes at the rate of 16% per annum on the unpaid principal balance; (iii) maturing five years and seven months from the Effective Date, subject to acceleration upon the occurrence of certain events, and (iv) being secured by a lien on the assets of Scott Cable, subordinate to the liens granted to (a) Finova in the Post–Confirmation Credit Facility, and (b) the holders of the Senior PIK Notes. (Pl. Ex. 114 at 1378.)

on the common stock issued according to the 1996 Plan. (Pl Ex. 114 at 1344.) Further, the Senior PIK Notes and the Junior PIK Notes would pay interest through the issuance of additional payment-in-kind ("PIK") notes. (*Id.*) The Debtors planned to offer notes with a PIK feature because they projected that Scott Cable would not have sufficient cash flow to make payments on those notes after paying operating expenses, capital expenses and interest payments to Finova. (Tr. D.I. 775 at 160:4—160:12.) Therefore, except for the cash payment made to Public Debenture Holders on the effective date of the plan, no payments were expected to be made to the Public Debenture Holders or the 1993 Junior Noteholders on account of the reorganization securities received under the Plan until the notes mature. (*Id.*)

Section VII.E. of the 1996 Disclosure Statement (which appeared only in the Second Amended Disclosure Statement) further provided:

> The Debtors expect that the [Senior PIK Notes] and [Junior PIK Notes] will be paid from the proceeds of a subsequent refinancing of Reorganized Scott's indebtedness or from the proceeds of a "Transaction Event" which is defined in the Plan as (i) the merger, consolidation, liquidation, reorganization or dissolution of Reorganized Scott; (ii) the sale of all of the cable television systems currently owned by Scott, and (iii) any similar transaction including, without limitation, the reclassification of the capital stock of Reorganized Scott or the dividend or other distribution of any corporate asset to shareholders. [footnote in original: The maturity of both the [Senior PIK Notes] and [Junior PIK Notes] will accelerate upon the occurrence of a Transaction Event.] The Debtors expect that the financing or a Transaction Event will occur before January 1, 2000. . . .

Regardless of when a refinancing or Transaction Event occurs, there is no assurance that Reorganized Scott will be able to realize the value necessary to pay the [Senior PIK Notes] (which are subordinated to the Post–Confirmation Credit Facility) or the [Junior PIK Notes] (which are subordinated to both the Post–Confirmation Credit Facility and the [Senior PIK Notes]. . . . In the event the [Senior PIK Notes] and [Junior PIK Notes] cannot be paid off in full at maturity, it may be necessary for Reorganized Scott to commence another case under the Bankruptcy Code, in which event the claims represented by the [Senior PIK Notes] and [Junior PIK Notes] should be secured claims (to the extent the value of their collateral is equal to or exceeds the amount of the debt) as opposed to the unsecured status of Classes 6 [Public Debentures] and 7 [1993 Junior Notes] under the Plan.

(Pl. Ex. 114 at 1344–45.)

(b) *New common stock and post-confirmation corporate governance*

The officers of Scott Cable would continue as officers in reorganized Scott Cable, including retaining Bruce Armstrong as the Chief Executive Office of reorganized Scott Cable. (Pl. Ex. 114 at 1336.) Post-confirmation, the common stock of reorganized Scott Cable would be held by the Manager, *i.e.*, Scott Cable Management Co., Inc. (New Class A Common Stock); the Junior PIK Noteholders (New Class B Common Stock); and the Senior PIK Noteholders (New Class C Common Stock). The five-member board of directors of reorganized Scott Cable would be elected annually as follows: two directors elected by the Manager, one director elected by the Junior PIK Noteholders, and two directors elected by the Senior PIK Noteholders. (Pl. Ex. 114 at 1399.)

On the earlier of December 31, 1999 or the occurrence of a "Transaction Event," the New Class C Common Stock held by the Senior PIK Noteholders would automatically convert to new Class A Common Stock, which would give the Senior PIK Noteholders control of the Board of Directors.[24] (Pl. Ex. 114 at 1400.)

### (c) Valuation and Liquidation Analyses

The 1996 Disclosure Statement advised that DLJ estimated the enterprise value of Scott Cable as a whole fell within a range between $140 and $160 million. (Pl. Ex. 114 at 1346.) The 1996 Disclosure Statement also discussed the appraisal performed by the Debtors' court-approved appraiser, Waller, which determined that the fair market value of Scott's cable television systems as of June 30, 1996 was $142.251 million. (Id.) The Debtors believed the two appraisals were consistent. (Id.)

The Debtors asserted that the 1996 Plan met the Bankruptcy Code's "best inter-ests" test, which the Debtors described as requiring "the Bankruptcy Court [to] find that the Plan provides to each member of each impaired Class of Claims and Interests a recovery which has a present value of the distribution which each such person would receive from its respective debtor if that debtor were instead liquidated under chapter 7 of the Bankruptcy Code." (Id. at 1348.) Exhibit C to the 1996 Disclosure Statement set forth a Liquidation Analysis to demonstrate that the distributions made to impaired creditors under the plan were greater than the distributions—if any— that those creditors would receive in a chapter 7 liquidation. (Id. at 1420–21.)

The Initial Plan and Disclosure Statement did not attach a Liquidation Analysis, but only included an Exhibit C stating that a Liquidation Analysis would be provided. (Pl. Ex. 109 at 1575.) The Liquidation Analysis attached to the First Amended Disclosure Statement described the distribution of "PreTax" Liquidation Proceeds to unsecured creditors as follows:

| Amount Available for Unsecured Creditors (PreTax*) | Percent Recovery in Liquidation (PreTax) | Percent Recovery under Plan |
|---|---|---|
| Class 6 (Zero Coupon) | 100% | 100% |
| Class 7 [Public Indentures] | 100% | 100% |
| Class 8 [1993 Junior Notes] | 14% | 100% |
| Class 9 Other Unsecured | 69% | 100% |
| | | |

* Taxes arising from the sale of the systems would be substantial. The payment of such taxes would significantly reduce the amount of cash available for Unsecured Creditors. (Pl. Ex. 113 at 0997.)

24. Although defined in the 1996 Disclosure Statement without reference to a Plan section, the definition of "Transaction Event" was not included in the section for defined terms or the section regarding class treatment, but, instead, was buried in Section 10.6 of the 1996 Plan (describing convertibility of the stock) as "(i) the merger, consolidation, liqui-dation, reorganization or dissolution of Reorganized Scott; (ii) the sale of all of the cable television systems currently owned by Scott, and (iii) any similar transaction including, without limitation, the reclassification of the capital stock of Reorganized Scott or the dividend or other distribution of any corporate asset to shareholders." (Pl. Ex. 114 at 1400.)

The Liquidation Analysis attached as Exhibit C to the final 1996 Disclosure Statement changed significantly, providing as follows:

## LIQUIDATION ANALYSIS

I. Liquidation Value of Assets of Scott

| | | | |
|---|---|---|---|
| A. | Proceeds from Sale of Operating Businesses | $142,251,000 [a] | |
| | Before Applicable Discount | 21,337,000 [b] | |
| | Less: Applicable Discount | $120,914,000 | |
| | Cash on Hand | 10,900,000 [c] | |
| | | $131,814,000 | |
| B. | Costs.and Fees of Scott Liquidation | $ 1,800,000 [d] | |
| | Selling Transaction Fees | 1,500,000 [e] | |
| | Chapter 7 Expenses | $ 3,300,000 | |
| C. | Liquidation Proceeds Available to Scott Creditors | $ 128,514,000 | |

II. Recovery By Scott Creditors

| | | |
|---|---|---|
| A. | Liquidation Proceeds Available | $128,514,000 |
| B. | Scott Liabilities | |
| | Secured Creditors | 50,000,000 |
| | Administrative Expenses | 2,000,000 [f] |
| | Tax Claims | 43,965,000 [g] |
| | | $ 32,549,000 |

| | | |
|---|---|---|
| C. | Amount Available for Unsecured Creditors | $ 32,549,000 |
| | Class 5 (Zero Coupon) ($13,307,105) | $ 13,307,105 |
| | Class 6 [Public Debentures] ($55,087,153) | $ 18,899,895 |
| | Class 7 [1993 Junior Notes] ($38,925,797) | $ --0-- |
| | Class 8 (Other Unsecured) (1,140,000) | $ 342,000 |
| Total Unsecured Claims ($108,460,055) | | $ 32,549,000 |

a From Waller appraisal (See Article VIII of the Disclosure Statement)

b Fifteen (15%) percent Chapter 7 discount. See Article IX.B. of the Disclosure Statement.

c Projected Cash on Confirmation Date.

d Estimated by Scott.

e Estimated by Scott.

f Estimated by Scott.

g Represents estimated tax liability based on assumed capital gain of $120,914,000, reduced by estimated net operating loss carryforward available to Scott of approximately $11,000,000.

The percent of recovery for unsecured creditors included in the 1996 Disclosure Statement's Liquidation Analysis was as follows:

| | Percent Recovery in Liquidation | Percent Recovery under Plan |
|---|---|---|
| Class 5 (Zero Coupon) | 100% | 100% |
| Class 6 [Public Debentures] | 34% | 100% |
| Class 7 [1993 Junior Notes] | -0- | 85% |
| Class 8 (Other Unsecured) | 30% | 100% |

(Pl. Ex. 114 at 1420–21.) (Final footnotes omitted.)

(d) *Tax Provisions*

The Initial Plan provided for full payment of priority tax claims, but noted that the Debtors were unaware of the existence of any holders of Allowed Priority Tax Claims. (Pl. Ex. 109 at 1482, 1548.) The Initial Plan also included a section for "Certain Federal Income Consequences of the Plan," which provided—in all capital letters—and in part:

> THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN ARE UNCERTAIN DUE TO THE LACK OF APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN THE TAX LAW. NO RULINGS WILL BE SOUGHT FROM THE INTERNAL REVENUE SERVICE (THE "IRS") WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN, AND NO OPINION OF COUNSEL HAS BEEN REQUESTED OR OBTAINED WITH RESPECT TO ANY SUCH ASPECTS. THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OR ALL OF THE TAX CONSEQUENCES OF THE PLAN, INCLUDING THE UTILIZATION OF THE DEBTORS' TAX ATTRIBUTES, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED.

(Pl. Ex. 109 at 1505–06.) The 1996 Disclosure Statement did not change with respect to its treatment of priority tax claims, except to estimate that Allowed Priority Tax Claims paid on the Effective Date were expected to be less than $100,000.00 (Pl. Ex. 114 at 1327.) The language in the section for Certain Federal Income Consequences of the Plan, as quoted above, did not change. (Pl. Ex. 114 at 1351.)

L. *The Government's Actions During the 1996 Bankruptcy Case*

At the time the petition was filed in the 1996 Bankruptcy Case, it was the practice of the U.S. Attorney's Office in Wilmington, Delaware to monitor chapter 11 filings for "large dollar cases," meaning those cases that involved assets of $50 million or more. (Tr. 11/3/2006, D.I. 782 (Tr. D.I. 782) at 30:1—30:19.) The 1996 Bankruptcy Case satisfied the "large dollar case" criterion and on February 26, 1996, the U.S. Attorney's Office opened a file for the 1996 Bankruptcy Case. (*Id.* at 30:25—31:16; Def. Ex. 193, 194.) On February 28, 1996, an Assistant United States Attorney ("AUSA"), filed a Notice of Appearance, Request for Matrix Entry and Request for Service of Notices and Documents on behalf of the Government. (Def. Ex. 9; Stip. Facts—Def. ¶ 93.)

Also on February 28, 1996, the AUSA sent a letter to the Internal Revenue Service Special Procedures Office in Wilmington, Delaware (the "Wilmington IRS Office") to advise that the 1996 Bankruptcy Case was filed and that it was the responsibility of that IRS office to file a timely proof of claim. (Def. Ex. 191.) On the same date, the AUSA sent a letter to the Assistant District Counsel in the IRS District Counsel's office in Washington, D.C. to advise that the 1996 Bankruptcy Case was a "large dollar case" filing. (Def. Ex. 192.)

On March 4, 1996, the Wilmington IRS Office opened a case on its Automated Insolvency System ("AIS") for the 1996 Bankruptcy Case. (Def. Ex. 25 at 627.) On June 8, 1996, Elizabeth Hennessey ("Hennessey"), a bankruptcy specialist with Wilmington IRS Office, noted in the AIS that the Debtors "were in full compliance pre-petition." (Def. Ex. 25 at 633.)

On or about August 14, 1996, Hennessey noted that there was no reason to ask for an extension of the claim bar date. (*Id.*)

The AUSA began a leave of absence in June 1996 and, on June 12, 1996, filed a separate Notice of Appearance in the 1996 Bankruptcy Case on behalf of Miriam Howe, ("Howe"), an attorney with the District Counsel Office of the IRS in Washington, D.C. (Tr. D.I. 782 at 61:21—62:10; Def. Ex. 11.) Howe was transferred and, eventually, responsibility for the 1996 Bankruptcy Case was transferred to Sandra Jefferson, a Senior Attorney in the Office of Chief Counsel, Tax Exempt and Governmental Entities Division, located in Baltimore, Maryland. (Tr. D.I. 782 at 127:6—128:14; 129:9—130:13 (Jefferson Test.)) After speaking with Hennessey, on August 21, 1996, Jefferson wrote a memorandum to the District Director, Delaware–Maryland, and to William Spatz ("Spatz"), in the office of Assistant Chief Counsel, Washington, D.C. (the "IRS National Office"), to advise that the debtor entities did not owe any outstanding taxes and, therefore, the case would not be transferred to the Department of Justice to request an extension of the bar date. (Def. Ex. 12 and 13.)

On August 29, 1996, Debtors' counsel served a copy of the Initial Plan upon the service list for Government Agencies that included the AUSA, the Wilmington IRS Office, an IRS office in Philadelphia, PA, and the Secretary of the Treasury, Washington, D.C., among others. (Def. Ex. 111.) Jefferson received a copy of the Initial Plan and Disclosure Statement on September 9, 1996, and forwarded a copy of those documents to Spatz on the same day. (Def. Ex. 14.) In her cover memo-

randum, Jefferson pointed out that that the IRS did not have any priority tax claims, but noted that such claims were not impaired under the Initial Plan. (*Id.*)

At that time, Spatz was already responsible for many other assignments, so Kathryn Zuba ("Zuba"), Spatz's supervisor at the National Office, assigned the 1996 Bankruptcy Case to Carol Campbell ("Campbell"). (Tr. 1/19/07, D.I. 787 (Tr. "D.I. 787") at 22:23–23:20 (Campbell Test.)) Campbell had never reviewed a large dollar bankruptcy case before the 1996 Bankruptcy Case. (*Id.* at 49:13–14.) On September 13, 1996, after reviewing Initial Plan and Disclosure Statement, Campbell prepared a brief memo, signed by Zuba, to other divisions of the IRS National Office, including Corporate, Financial Instruments and Products ("FI & P"), and Income Tax and Accounting ("IT & A"). (Def. Ex. 16.) In the memo, Campbell advises that no claim was filed because it was determined that the Debtors did not owe any taxes, points out sections of the Initial Plan and Disclosure Statement addressing "Federal Tax Consequences" and treatment of priority claims, and asks the divisions to provide any comments on the documents directly to Jefferson. (*Id.*) Neither Campbell nor Jefferson recall ever being contacted by another IRS division regarding the Initial Plan and Disclosure Statement. (Tr. D.I. 787 at 45:14—46:20 (Campbell Test.); Tr. 12/11/2006, D.I. 783 ("Tr. D.I. 783") at 28:2—29:9 (Jefferson Test.))

On October 16, 1996, Jefferson wrote a memorandum to Campbell advising that October 27, 1996 was the deadline for filing objections to the Initial Plan.[25] (Def. Ex.

---

**25.** Although the October 16, 1996 memorandum advises of the deadline for filing objections to the Initial *Plan,* the deadline was actually for filing objections to the Initial

*Disclosure Statement.* (*See* Def. Ex. 18.) Moreover, the fax cover sheet attached to the October 16, 1996 memorandum shows that Jefferson sent the memo to Hennessey; how-

17.) This memo explained that the IRS Wilmington Office did not intend to file an objection because "the Plan is unobjectionable and the IRS has not filed a proof of claim." (*Id.*)

On October 23, 1996, Debtors' counsel served notice and a copy of the First Amended Disclosure Statement and Plan on Howe, at the Washington, D.C. address, and on the same Government Agencies service list, including the AUSA, the Wilmington IRS Office, an IRS Office in Philadelphia, PA, and the Secretary of the Treasury in Washington, D.C., among others.[26] (Def. Ex. 119.) Although she received the documents, Jefferson did not review the First Amended Disclosure Statement and Plan. (Tr. D.I. 783 at 242:19—25), nor did she send a copy to the IRS National Office believing there had been no changes between the Initial Plan and the First Amended Plan that affected the Government. (*Id.* at 52:25–53:8.)

On November 7, 1996, the Debtors served copies of the Second Amended Disclosure Statement, Second Amended Plan, Notice of Order approving the Second Amended Disclosure Statement and setting deadlines for voting, objections to confirmation and the confirmation hearing; and ballots upon Howe at the Washington, D.C. address, the Wilmington IRS Office, an IRS Office in Philadelphia, PA, and the Secretary of the Treasury in Washington, D.C., among others. (Def. Ex. 120.) In November 1996, Jefferson sent a memo and copy of the Second Amended Disclosure Statement and Plan to Campbell, advising that objections to plan confirmation had to be filed by November 27, 1996. (Def. Ex. 21.) The memo also advised that

"[w]e do not intend to file objections since the Plan is unobjectionable and the IRS has not filed a proof of claim. However, we would still like the National Office's views concerning the future tax consequences of the Plan." (*Id.*) Campbell had no specific recollection of receiving the memorandum and documents, but assumed she did receive them. (Tr. D.I. 787 at 77:20—78:1.)

### M. *The 1996 Plan is Confirmed and Becomes Effective*

On December 6, 1996, the Court held a hearing on the confirmation of the Debtors' 1996 Plan. (Pl. Ex. 119.) At the hearing, Debtors' counsel advised the Court that the 1996 Plan was "overwhelmingly accepted by all classes entitled to vote on the plan." (Pl. Ex. 119 at 2:11–14; 3:22–4:1.) Debtors' counsel advised that three objections to the 1996 Plan had been filed: one by a Texas state controller (which was withdrawn), and two by creditors who would be paid in full on the Plan's effective date. (Pl. Ex. 19 at 4:2—14.) In response to the Court's request to run through the requirements of § 1129, Debtors' counsel read a proffer of Armstrong's testimony (*Id.* at 12–18), which included a proffer that the primary purpose of the plan was not the avoidance of taxes, but rather "to preserve and protect Scott's viable business operations, to maximize distributions to creditors, and to allow creditors to participate in distributions in excess of those which would be available if the chapter 11 cases were converted to cases under chapter 7 of the Bankruptcy Code" (*Id.* at 14:8–9) and a proffer that confirmation of the plan was not likely to be followed by the liquidation or need for further financial

---

ever, Jefferson stated that, while she did not have a specific recollection, she also would have faxed the memorandum to Campbell, although it may have been after the objection deadline. (*Id.*; Tr. D.I. 783 at 43:17—45:10.)

**26.** The hearing to approve the First Amended Disclosure Statement was scheduled for Friday, November 1, 1996. (Pl. Ex. 115.)

reorganization (*Id.* at 17:10–24). After careful consideration of the objections to the 1996 Plan, the Court ordered that certain language be added to the proposed confirmation order to address his ruling on the objections.[27] An Order confirming the 1996 Plan was entered that same date. (Pl. Ex. 120.)

The 1996 Plan became effective on December 18, 1996. (Pl. Ex. 148 at CTO975.) On the effective date, the following events occurred pursuant to the 1996 Plan: (i) Scott Cable closed on the $67.5 million credit facility with Finova; (ii) the Senior Secured Debt, Subordinated Secured Debt and the Unsecured Zero Coupon Notes were paid in full; (iii) holders of unsecured trade debt were paid in full; (iv) Scott Cable made certain payments to the Public Debenture Holders; (v) Scott Cable issued the Senior PIK Notes and the Junior PIK Notes; (vi) existing common stock was cancelled and the following new stock was issued: Class A common stock representing 1% of equity was issued to management; Class B common stock representing 24% of equity was issued to the 1993 Junior Noteholders; and Class C common stock representing 75% of equity was issued to the Public Debenture Holders. (*Id.* at CTO975, CTO978–79.) Neither the Public Debenture Holders, the 1993 Junior Noteholders nor management provided any new cash or assets to Scott Cable in exchange for the Senior PIK Notes, Junior PIK Notes or new stock. (Tr. D.I. 776 at 41:7—41:15.)

On December 18, 1996, the Indenture Trustee for the Junior PIK Notes, and Scott Cable executed an Indenture, a Security Agreement, as well as Subordination Agreements, with respect to the Junior PIK Notes. (Pl. Exs. 121, 123—126.) The Junior PIK Notes were divided into two groups: "Series A," consisting of 85% of the total amount available for payment, and "Series B," consisting of the remaining 15% of the total amount available for payment. (Pl. Ex. 126 at 3397.) Consistent with the 1996 Plan, the Series A Junior PIK Notes were distributed to the prior 1993 Junior Noteholders, and the Series B Junior PIK Notes were distributed to the prior holders of the Public Debentures.[28]

After the effective date, Scott Management remained as management of Scott Cable, with Armstrong remaining as CEO. (Pl. Ex. 114 at 1336, 1377.) On the Effective Date, Scott Management and the Series A Junior PIK Noteholders entered into a new management incentive agreement (the "1996 Management Incentive Agreement"). (Pl. Ex. 122.) Under the terms of the 1996 Management Incentive Agreement, the Series A Junior PIK Noteholders agreed to allocate to Scott Management 21 1/2 % of any recovery on the Series A Junior PIK Notes or Class B stock. (*Id.*)

N. *Scott Cable after the 1996 Bankruptcy Case*

In June 1995, the Federal Communications Commission extended regulatory rate relief to small cable operators, which al-

---

**27.** The objections were filed by holders of Senior Secured Notes that voted to accept the 1996 Plan "conditionally," but objected to the total claim amount that the Debtors proposed to pay to them on the effective date due to a dispute over whether the noteholders were entitled to payment of interest at the default rate. At the Court's direction, the Debtors were ordered to place specific amounts into an escrow account to protect the objecting parties pending resolution of the interest rate issue. (Pl. Ex. 119.)

**28.** Hereinafter, holders of the Series A Junior PIK Notes are referred to herein as the "Series A Holders," and holders of the Series B Junior PIK Notes are referred to as the "Series B Holders."

lowed for greater flexibility in establishing and increasing rates. (Pl. Ex. 148 at CT0983.) In February 1996, Congress enacted the Telecommunications Act of 1996 (the "1996 Act") which, among other things, deregulated service, but also intended to foster competition by allowing direct broadcast satellite television. (Tr. D.I. 776 at 34:15—36:20.)

After the 1996 Bankruptcy Case, Scott Cable, through its CEO Armstrong, again hired HPC to market the Company. (Id. at 67:21—68:2.) In the summer of 1997, HPC learned that Interlink Communications Partners, LLP ("Interlink") was interested in purchasing substantially all of the assets of Scott Cable. (Id. at 68:3–9; Pl. Ex. 147 at 10796.) Interlink offered initially to purchase Scott Cable's assets in a price range between $136 million and $143 million. (Pl. Ex. 196 at 8:25—9:6.) That offer was rejected as insufficient. (Id.) In October 1997, HPC returned with an offer of $150 million from Interlink, and Scott Cable's board of directors found the price sufficient to start negotiations in earnest. (Id. at 9:7–12.) Due to changes in the market around that time, the Company's board of directors decided that even Interlink's revised offer was too low, and decided to set the price for Scott Cable at $165 million. (Pl. Ex. 196 at 9:13–25.) In acknowledgement of Interlink's investment in the process, Scott Cable offered that price to Interlink prior to starting another marketing campaign, and Interlink accepted. (Id. at 10:1–14.)

Armstrong was aware that the proceeds from the sale to Interlink were not enough to pay the Junior PIK Notes and the tax obligations resulting from the sale. (Tr. D.I. 776 at 69:1–10.) As an officer of Scott Cable, Armstrong was concerned that he and other officers could be held personally liable for authorizing payment of the Junior PIK Notes rather than the taxes. (Id.

at 69:1—70:8.) As a result, Armstrong considered a second bankruptcy filing to obtain a court order approving the sale and the payments. (Id.).

In April 1998, Scott Cable's board of directors met with bankruptcy counsel to review plan of reorganization alternatives that could, among other things, provide for closing of the purchase agreement with Interlink after entry of the confirmation order "to insure that tax liability triggered by the sale is not an administrative claim," and include "releases (and injunctive protections) for all officers and directors from all liability including, without limitation, claims of the Internal Revenue Service and state and local taxing authorities relating to tax liability triggered by the sale of assets." (Pl. Ex. 142.)

On July 10, 1998, Scott Cable and Interlink entered into an Asset Purchase Agreement (the "APA") pursuant to which Interlink agreed to purchase substantially all of Scott Cable's cable television systems and related assets for $165 million. (Pl. Ex. 147 at 10797, 10879–10948.) The APA provided that Scott Cable would seek to complete the sale through a chapter 11 bankruptcy plan. (Id. at 10922–24.) The APA provided that closing on the sale would occur "no sooner than sixty (60) days after the entry of the Confirmation Order." (Id. at 10902.)

On August 17, 1998, Scott Cable solicited approval of a pre-packaged liquidating chapter 11 plan by distributing a disclosure statement (the "1998 Disclosure Statement") and ballots to creditors in Class 1 (Finova), Class 2 (Senior PIK Notes) and Class 3 (Junior PIK Notes). (Id. at 10782–83.) The proposed plan of liquidation incorporated the terms, provisions and conditions of the A PA, including the requirement that closing of the sale occur after the entry of a Confirmation Order. (Id. at 10865 ¶ 8.17.) The 1998

Disclosure Statement also provided notice of the non-payment of claims including taxes that would arise after the bankruptcy filing, as follows:

BECAUSE THE SECURED CLAIMS AGAINST THE COMPANY EXCEED THE VALUE OF THE COMPANY'S ASSETS, FOLLOWING THE SALE AND LIQUIDATION OF THE COMPANY CONTEMPLATED BY THE PLAN THERE WILL BE NO FUNDS AVAILABLE TO PAY LIABILITIES ARISING ON OR AFTER THE CONFIRMATION DATE, EXCEPT AS EXPRESSLY PROVIDED IN THE PLAN. SPECIFICALLY, THERE WILL BE NO FUNDS AVAILABLE TO PAY FEDERAL, STATE OR LOCAL INCOME OR SIMILAR TAXES ARISING AS A RESULT ... OF THE SALE ASSETS, AND SUCH TAX CLAIMS WILL BE BARRED FROM RECOVERY AGAINST THE PURCHASER, THE SALE ASSETS, THE PROCEEDS, THE EXCLUDED ASSETS, THE COMPANY, ITS AFFILIATE, OFFICERS AND DIRECTORS, THE OFFICERS AND DIRECTORS' INDEMNITY ESCROW FUND AND ITS AGENT, THE ADMINISTRATIVE TRUST AND ITS TRUSTEE, OR HOLDERS OF CLAIMS OR INTERESTS....

(*Id.* at 10786–87.) In Section VIII titled "Tax Consequences To Debtor Arising From the Sale of the Sale Assets," the disclosure statement further explained that the sale of the Debtor's assets to Interlink would give rise to approximately $37.4 million of federal and state income tax liabilities that would not be paid. (*Id.* at 10834.) The 1998 Disclosure Statement also provided that, upon effective date of the plan, certain parties, generally, and taxing authorities, specifically, would be enjoined from bringing any action against the Debtor, its officers and directors, and that certain third party releases would be granted. (*Id.* at 10813–14.)

### O. Scott Cable Files a Second Bankruptcy Case

On October 1, 1998, Scott Cable filed a chapter 11 bankruptcy petition in the Bankruptcy Court for the District of Connecticut (the "1998 Bankruptcy") together with the 1998 Disclosure Statement and the prepackaged plan of liquidation (the "1998 Plan"). At a hearing on November 13, 1998, the Connecticut Bankruptcy Court approved the asset sale to Interlink, free and clear of all liens and encumbrances, under Bankruptcy Code § 363. (Pl. Ex. 196.)

The IRS objected to confirmation of the 1998 Plan, arguing that the plan failed to provide for payment of the capital gains tax arising from the sale as an administrative expense, provided for an injunction in violation of the Anti–Injunction Act (26 U.S.C. § 7421(a)) and because the 1998 Plan's principal purpose was to avoid taxes. *In re Scott Cable Commc'n, Inc.*, 227 B.R. 596, 599 (Bankr.D.Conn.1998) ("*Scott I*"). At a hearing on November 23, 1998 on the prepackaged plan and disclosure statement, the Connecticut Bankruptcy Court approved (without objection) the 1998 Disclosure Statement, but—based on the significant objections raised by the IRS—reserved judgment on the 1998 Plan. (Pl. Ex. 197 at 8.)

On December 11, 1998, the Connecticut Bankruptcy Court issued a memorandum opinion and order denying confirmation of the 1998 Plan. *Scott I,* 227 B.R. at 604. The Court's main reasoning for denying confirmation of the plan was that it failed to satisfy the requirement under Bankruptcy Code § 1 129(d), which provides that a Court may not confirm a plan if the principal purpose of the plan is the avoid-

ance of taxes. *Id.* at 601. The Court wrote:

> The Debtor has conceded that "[t]he principal purpose of the Plan ... has always been to structure a sale ... that is acceptable to the [Junior PIK Noteholders]...." *Debtor's Response* at 1–2. It is apparent that in order for that group to benefit from the Sale, the Plan would have to structure the Sale so that there would be no administrative capital gains tax and no future tax liability for the Jr. PIK Note Holders, and that is its principal purpose. Accordingly, the Plan does not escape the § 1129(d) prohibition, and it cannot be confirmed.

*Id.* at 604. The Court further held that the 1998 Plan could not be confirmed because its release provisions would prevent the IRS and other taxing authorities asserting claims for unpaid taxes against officers, directors and others defined as "Company Releasees" in violation of 26 U.S.C. § 7421, the Anti–Injunction Act. *Id.* at 602.

### P. *The Sale of Scott Cable's Assets*

Failure to obtain confirmation of the 1998 Plan also meant that Scott Cable failed to satisfy a condition precedent to closing the APA. However, Scott Cable and Interlink agreed to extend the sale's closing date and, on January 7, 1999, entered into an amended APA. (Pl. Ex 197 at 10:24–11:5.) On January 14, 1997, the Connecticut Bankruptcy Court approved the Debtor's motion for authority to sell essentially all of its assets to Interlink pursuant to Bankruptcy Code § 363. (Pl. Ex. 197 at 32:8—33:3.)

The sale to Interlink closed on February 12, 1999, and the proceeds paid to Finova and the Senior PIK Notes. (Tr. D.I. 776 at 76:23—77:12; 78:12–24.) *See also United States v. State Street Bank and Trust Co. (In re Scott Cable Commc'n,*

*Inc.("Scott II"))*, 259 B.R. 536, 542 (D. Conn. 2001). The remaining proceeds (approximately $30,291,296.00) were placed into an interest-bearing escrow account. The claims of the IRS (approximately $37.4 million) and the Junior PIK Noteholders (more than $49 million) remained unpaid. (*Scott II*, 259 B.R. at 541, 542.)

### Q. *The IRS's Adversary Proceeding*
### (1) *The Adversary Proceeding before the Connecticut Courts*

On November 19, 1998, the Government filed the instant adversary proceeding against the Indenture Trustee for the Junior PIK Notes seeking to recharacterize the Junior PIK Notes as equity. On December 17, 1998, the Government filed an amended complaint adding a claim for equitable subordination of the claims of the Junior PIK Noteholders to the claim of the IRS.

On December 14, 1998, Scott Cable filed a motion to intervene and a Rule 12(c) motion for judgment on the pleadings. On January 4, 1999, the Indenture Trustee filed a motion to dismiss the amended complaint. The Connecticut Bankruptcy Court determined that the Government's adversary proceeding was barred by the res judicata effect of the order confirming the 1996 Plan, but that decision was reversed by the Connecticut District Court. *United States v. State Street Bank and Trust Co. (In re Scott Commc'n, Inc.)*, 232 B.R. 558 (Bankr. D.Conn. 1999) *rev'd Scott II*, 259 B.R. 536. The Connecticut District Court held that the Government's adversary proceeding was not barred by *res judicata*, deciding:

> [T]he circumstances in the Delaware Proceeding [*i.e.,* the 1996 Bankruptcy Case] were such that the IRS did not hold a claim and thus was not a creditor relying on the claims allowance procedures and the information conveyed to

the IRS tended to suggest that the IRS was not affected by the [1996 Plan]; that the information conveyed to the IRS tended to suggest that all tax claims were being paid; that the relevant law which would have informed the IRS's understanding of the information being conveyed to it should not have caused the IRS to see any particular "red flags"; that the discussion, in the information conveyed to the IRS, about the implications of the conversion to secured creditor status of the holders of the [Junior PIK Notes] was suggestive of other concerns; that, in the information conveyed to the IRS, there was no clear, limited set of possibilities; and that the IRS was entitled to assume it would receive full and fair disclosure. It is true that the IRS should be deemed to be sophisticated. It is also true that a thorough analysis of all the scenarios that were possible as a result of confirmation of the Delaware Plan would have revealed to the IRS that its pecuniary interests could be adversely affected under certain scenarios. However, where it is the common understanding that what the law requires is full and fair disclosure, where the circumstances tended to indicate that confirmation of the plan would not adversely affect any pecuniary interest of the IRS, and where nothing in the Delaware Plan and the Delaware Disclosure Statement explicitly stated or even suggested that, in fact, the IRS's pecuniary interests could be adversely affected, it can not be said that the plan or the disclosure statement was reasonably calculated to inform even a sophisticated party in interest like the IRS that its pecuniary interests could be affected. Notice, given in such a way that a thorough analysis of all possible scenarios is required before the recipient can discern that its pecuniary interests could be adversely affected, is not notice given by a "means . . . such as one desirous of actually informing the absentee might reasonably adopt to accomplish it," . . . nor does it appear to satisfy the requirement that there be disclosed "information of a kind, and in sufficient detail," . . . as would enable a person to make an informed judgment about the plan.

*Scott II*, 259 B.R. at 547–48 (citations omitted).

The Connecticut District Court remanded the adversary proceeding to the Connecticut Bankruptcy Court for further proceedings, and the Connecticut Bankruptcy Court, *sua sponte*, issued an order to show cause why the venue of the adversary proceeding should not be transferred to the Delaware Bankruptcy Court. *United States v. State Street Bank and Trust Co. (In re Scott Cable Commc'n, Inc. ("Scott III"))*, 263 B.R. 6 (Bankr.D.Conn.2001).[29] The Government opposed the transfer, but the Connecticut Bankruptcy Court held that the Delaware Bankruptcy Court was the appropriate forum to determine the proceeding, after considering that determination of the adversary proceeding required "interpretation of the effect of the Delaware Plan, of which the IRS had inadequate notice," and "an examination of the [1996 Bankruptcy Case] record." *Scott III*, 263 B.R. at 9. Thus, on June 7, 2001, the Connecticut Bankruptcy Court trans-

---

**29.** The Connecticut Bankruptcy Court framed the issue to be decided on remand as requiring "a determination of whether the classification of the [Junior PIK Notes] as holders of secured claims in the confirmed Delaware Plan is binding on the IRS" or "[p]ut another way, . . . assuming that the IRS would have objected if it had been given specific notice, the issue is whether the Delaware Plan would have been confirmed over any objection that the IRS might have raised." *Scott III*, 263 B.R. at 8.

ferred the instant adversary proceeding to the Delaware Bankruptcy Court. *Id.*

### (2) *The Adversary Proceeding before the Delaware Bankruptcy Court*

On March 20, 2002, the Indenture Trustee moved for Joinder of Persons Needed for Just Determination seeking to join all Junior PIK Noteholders as defendants to the instant adversary proceeding (the "Joinder Motion"). (D.I. 77.) Before the Joinder Motion was decided, on August 28, 2002, MC Partners, Chestnut Street, Milk Street and TA Investors moved to intervene. (D.I. 100.) On October 4, 2002, the Court entered an order allowing the intervention. (D.I. 116.)

On December 6, 2002, the Court denied the Joinder Motion. (D.I. 160 at 6:14–18.) Instead of joining each Junior PIK Noteholder as a defendant to the adversary, the Court directed that notice of the adversary proceeding be given to the record holders of the Junior PIK Notes, along with the request that the notice be forwarded on to the beneficial owners of the Junior PIK Notes. (*Id.* at 7:13—10:2.) The Court directed that the notice should (i) attach a copy of the amended complaint; (ii) identify the substantial noteholders who had intervened in the case; (iii) briefly explain the two causes of action; (iv) explain that the interests of all Junior PIK Noteholders in defending the action, especially with respect to Count 2 seeking equitable subordination, may not be identical; and (v) advise that individual Junior PIK Noteholders have the option of moving to intervene in the adversary. (*Id.*) The Indenture Trustee sent notices regarding this adversary proceeding to the record holders and encouraged Series B Junior PIK Noteholders to intervene. (Tr. 12/14/2006, D.I. 786 at 154:21—155:6; 185:21—186:3.)

The Indenture Trustee moved for summary judgment, arguing, in part, that the relief sought in the complaint was barred by the Court's final order confirming the 1996 Plan. By Memorandum and Order dated December 12, 2003, the Court denied the Indenture Trustee's motion for summary judgment (D.I. 239, D.I. 240.)

Next, the Government moved for summary judgment. (D.I. 267.) After many extensions of the briefing schedule and the filing of cross-motions for summary judgment and other related motions, a "Notice of Completion of Briefing of Dispositive and Related Motions" was filed June 15, 2005. (D.I. 315.) At a hearing on July 22, 2005, my colleague, the Honorable Peter J. Walsh, held that the claims required a fact-intensive analysis and did not lend themselves to summary judgment. (D.I. 318.) He ordered that the matter be scheduled for a trial on the merits. (*Id.*)

On December 23, 2005, the Government moved that Judge Walsh, who had entered the Order confirming the 1996 Plan, should recuse himself from this case. (D.I. 321.) In its motion, the Government did not allege any bias on the part of Judge Walsh; rather, the Government argued that recusal was appropriate "at least to avoid the *appearance* of partiality under 28 U.S.C. § 455(a), due to actual and implicit findings in confirming the [1996 Plan] giving rise to the present debtor, Scott Cable Communications, Inc.—and possibly also because of personal knowledge of disputed evidentiary facts within the purview of § 455(b)(1)." (D.I. 322 at 1.) The Defendants opposed the recusal request. (D.I. 323, 324.) Although Judge Walsh determined that the recusal motion was untimely and without merit, he transferred the adversary proceeding to me, concluding that it was in the interest of judicial economy to remove a possibility for appeal and due to scheduling conflicts on his calendar for the start of the trial. (D.I. 328 at 2.)

By order entered on January 27, 2006, the case was transferred to me. (D.I. 329.)

The Government then filed a motion to re-transfer venue of the adversary proceeding back to the Connecticut Bankruptcy Court (D.I. 331), which was denied by Order dated April 11, 2006 (D.I. 410).

### (3) Trial

After numerous discovery motions and pre-trial motions, trial began on October 16, 2006, and continued on the following dates: October 17, 18, 19, 20, 23, 25, 26, 27, 30, 31, 2006; November 1, 2, 3, 2006; December 11, 12, 13, 14, 2006; January 19, 2007; February 12, 28, 2007; March 1, 2, 5, 6, 30, 2007; April 23, 2007; and May 10, 22, 23, 24, 25, 2007. Closing arguments were completed on June 22, 2007. Thereafter, the parties began their post-trial briefing, which introduced more rounds of motions. A certification that the record was complete was filed September 2, 2008. (D.I. 801.)

### (4) The Chapter 7 Trustee

On March 10, 2009, approximately two years after the trial for the instant adversary proceeding had ended, the Connecticut Bankruptcy Court converted the 1998 Bankruptcy Case to chapter 7 and appointed Ronald Chorches as chapter 7 Trustee (the "Trustee"). (D.I. 804 at 2.) The Trustee filed a motion to substitute himself in the adversary proceeding in place of the Debtor, to realign himself as a plaintiff, to supplement the record, and to amend the Complaint to assert a fraudulent conveyance claim. (D.I. 839). The Trustee's motion was granted, in part, to allow the Trustee to be realigned as a plaintiff in this adversary proceeding, and to admit certain documents. However, the Trustee's request to amend the complaint to assert a fraudulent conveyance claim was denied. (D.I. 911).

On June 8, 2009, the Trustee filed an Objection to the Proof of Claim filed by State Street Bank and Trust Company, as Indenture Trustee for the Junior Subordinated PIK Notes (the "Claim Objection") in the Connecticut Bankruptcy Court. On June 25, 2009, U.S. Bank filed a motion to strike the Claim Objection (the "Motion to Strike"). The Trustee filed a Second Amended Claim Objection on November 5, 2009 (the "Amended Claim Objection").

On March 8, 2011, the Connecticut Bankruptcy Court approved an Agreed Order among the Trustee, U.S. Bank and the IRS to transfer the Claim Objection, Amended Claim Objection and Motion to Strike and related pleadings (the "Claim Objection Proceeding") to this Court for disposition. The Claim Objection Proceeding was docketed as Miscellaneous Proceeding 11–00105 in the Delaware Bankruptcy Court on March 16, 2011.

On March 29, 2011, without conceding the necessity of an adversary proceeding, the Trustee filed an adversary complaint in the Connecticut Bankruptcy Court asserting that the Debtor's granting of a lien to secure the Junior PIK Notes was a fraudulent conveyance pursuant to 11 U.S.C. § 544(b) and applicable New York state law. The adversary complaint was amended on March 31, 2011 (the "Amended Complaint").

On May 17, 2011, the Connecticut Bankruptcy Court entered a Consent Order to transfer the Amended Complaint to the Delaware Bankruptcy Court. The Amended Complaint was docketed as Miscellaneous Proceeding 11–00106 in the Delaware Bankruptcy Court on June 2, 2011.

By Memorandum and Order issued simultaneously with this Opinion, I granted the Motion to Strike the Trustee's Claim Objection and granted the Motion to Dismiss the Trustee's Amended Complaint.

## IV. CONCLUSIONS OF LAW

The Government's Amended Complaint seeks a determination of the validity, priority and extent of the Junior PIK Noteholders' lien against Scott Cable's assets. The Amended Complaint contains two counts: Count One seeks to recharacterize the Junior PIK Notes as preferred equity instruments of Scott Cable, with no lien against Scott Cable's assets; and Count Two seeks to equitably subordinate the Junior PIK Noteholders' claim to the administrative claims of federal and state taxing authorities.

[2–5] Recharacterization and equitable subordination are similar causes of action "grounded in bankruptcy courts' equitable authority to ensure 'that substance will not give way to form, that technical considerations will not prevent substantial justice from being done.'" *Cohen v. The KB Mezzanine Fund II, L.P. (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 454 (3d Cir.2006) (quoting *Pepper v. Litton*, 308 U.S. 295, 305, 60 S.Ct. 238, 84 L.Ed. 281 (1939)). Although similar, each cause of action is distinct and must be treated separately. *Id.* "In a recharacterization action, someone challenges the assertion of a debt against the bankruptcy estate on the ground that the 'loaned' capital was actually an equity investment." *In re Insilco Techs., Inc.* 480 F.3d 212, 217 (3d Cir. 2007). In other words, recharacterization is a determination as to "whether a debt actually exists." *SubMicron*, 432 F.3d at 454. An equitable subordination analysis, on the other hand, requires the court to review whether an otherwise "legitimate" creditor has engaged in inequitable conduct. *Bayer Corp. v. MascoTech, Inc. (In re Autostyle Plastics, Inc.)*, 269 F.3d 726,-749 (6th Cir.2001).

### A. Threshold Matters

The Defendants argue that the Government's claims are barred under a number of legal theories. I will address these threshold matters before addressing the merits of the case.

#### 1. Res Judicata

Attempting to resurrect one of their oldest arguments, the Defendants contend that the doctrine of *res judicata* bars the Government from bringing this adversary proceeding. The Defendants argue that the IRS, as a party in interest in the 1996 Bankruptcy Case, is bound by the order confirming the 1996 Plan and cannot challenge the issuance of the Junior PIK Notes. In response, the Government argues that the law of the case doctrine precludes the Defendants from re-raising the *res judicata* defense. In *Scott II*, the Connecticut District Court determined that the principles of *res judicata* did not bar the IRS from bringing the adversary proceeding because the IRS did not receive notice reasonably calculated, under the circumstances, to inform it that its rights might be affected by the 1996 Plan. *Scott II*, 259 B.R. at 548. The IRS asserts that the Connecticut District Court's decision is the law of the case on this issue.

"The law of the case doctrine 'limits relitigation of an issue once it has been decided' in an earlier stage of the same litigation." *Hamilton v. Leavy*, 322 F.3d 776, 786–87 (3d Cir.2003) quoting *In re Continental Airlines, Inc.*, 279 F.3d 226, 232 (3d Cir.2002). "The purpose of this doctrine is to promote the 'judicial system's interest in finality and in efficient administration.'" *Hayman Cash Register Co. v. Sarokin*, 669 F.2d 162, 165 (3d Cir. 1982) quoting *Todd & Co., Inc. v. S.E.C.*, 637 F.2d 154, 156 (3d Cir.1980).

"[T]he law of the case doctrine does not restrict a court's power but rather governs its exercise of discretion." *In re City of Philadelphia Litig.*, 158 F.3d

711, 718 (3d Cir.1998) citing *Public Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116 (3d Cir.1997). Courts have recognized that the law of the case doctrine will not prevent reconsideration of previously decided issues in extraordinary circumstances when: (i) new evidence is available; (ii) a supervening new law has been announced; or (iii) the earlier decision was clearly erroneous and would create manifest injustice. *Philadelphia Litig.*, 158 F.3d at 718.

 The Defendants argue that the law of the case doctrine does not prevent this Court from reconsidering their *res judicata* defense due to (1) new facts uncovered during discovery and at the trial; (2) new defendants who intervened in this adversary after the *Scott II* decision; and (3) new facts which establish that the Connecticut District Court's opinion in *Scott II* is manifestly unjust.

### (a) *Newly Discovered Facts*

The Defendants argue that the *Scott II* Court decided the *res judicata* issue on a motion for summary judgment, without a fully developed factual record. As a result of the extensive discovery process and testimony of IRS employees at the trial, more detailed information has come to light regarding the Government's review of the 1996 Plan documents. The Defendants contend that the newly discovered facts require a new analysis of the *res judicata* defense.

The new facts that the Defendants ask the Court to consider include: (i) the number of Government employees who were forwarded copies of the various versions of Scott Cable's plans and disclosure statements during the 1996 Bankruptcy Case for review and comment; (ii) internal memos noting that the IRS did not intend to file an objection to the 1996 Plan be-

cause it was "unobjectionable" and the IRS had not filed a proof of claim; and (iii) internal IRS manuals, which instruct IRS lawyers to assess whether a bankruptcy case raises "postconfirmation issues" or whether a plan could create "adverse tax consequences." The inference the Defendants want the Court to draw from the new facts is that the IRS understood the future tax consequences of the 1996 Plan and found the plan "unobjectionable." I do not agree that such an inference arises here.

The Defendants further argue that the new facts change the *res judicata* analysis because those facts show that the IRS *should have known* that adverse tax consequences could arise from the 1996 Plan and should have objected prior to confirmation of the 1996 Plan. However, I disagree with the Defendants' assertion that the new facts concerning the IRS's conduct, if they had been available to Connecticut District Court, would have changed the outcome of the previous decision.

After a close review of the 1996 Plan and 1996 Disclosure Statement, the *Scott II* Court held, as a matter of law, that those documents failed to provide the IRS with the requisite notice that the 1996 Plan could affect the IRS's future pecuniary interests. The Connecticut District Court determined that the documents did not disclose "that an intended or possible consequence of the plan was that under certain scenarios the IRS would be precluded from, or limited in any way in, pursuing a claim against Reorganized Scott once the [1996 Plan] was confirmed." *Scott II*, 259 B.R. at 546. The *Scott II* Court noted that the 1996 Disclosure Statement purported to describe "certain federal income tax consequences of the plan," but made no mention of those intended or potential tax consequences, and, in particular, did not

include a disclaimer that the tax consequences of Transaction Events were not being addressed. *Id.* In short, either Scott Cable was aware of the potential consequences of its plan, but failed to provide full and fair disclosure of that consequence, or Scott Cable was unaware of the potential consequence, in which case "it is difficult to see how the IRS could be expected to have discerned that its pecuniary interest could be adversely affected." *Scott II,* 259 B.R. at 546, n. 1.

Regardless of the Government's actions or inactions, the *Scott II* Court concluded that the 1996 Plan and Disclosure Statement were not reasonably calculated to inform even a sophisticated party-in-interest like the IRS that its pecuniary interests could be affected by the 1996 Plan. The "new facts" cited by the Defendants do not change this conclusion of law.

#### (b) *New Defendants*

The Defendants argue that those Defendants who intervened after *Scott II* was decided are not bound by that decision, relying on the Third Circuit Court's decision in *Hamilton,* 322 F.3d at 787 ("the law of the case doctrine should not be read so rigidly that it precludes a party from raising an argument that it had no prior opportunity to·raise" (internal quotations omitted)). *Hamilton,* however, is distinguishable. In *Hamilton,* the plaintiff amended the complaint to add new defendants after the court ruled that the earlier-named defendants had violated the plaintiff's Eighth Amendment rights. The Third Circuit determined that the law of the case did not prevent the new defendants from arguing that they did not violate the plaintiff's Eighth Amendment rights. *Id.* The issue was a factual one particular to each defendant.

■ In contrast, the intervening defendants here seek to re-litigate a previously decided legal issue and the result does not

change with respect to individual defendants. "[P]ermission to intervene does not carry with it the right to relitigate matters already determined in the case, unless those matters would otherwise be subject to reconsideration." *Arizona v. California,* 460 U.S. 605, 615, 103 S.Ct. 1382, 1389, 75 L.Ed.2d 318 (1983). *See also Galbreath v. Metropolitan Trust Co. of Calif.,* 134 F.2d 569, 570 (10th Cir.1943) ("[O]ne who intervenes in a suit in equity thereby becomes a party to the suit, and is bound by all prior orders and adjudications of fact and law as though he had been a party from the commencement of the suit.")

#### (c) *Manifest Injustice*

Finally, the Defendants argue that the law of the case should not be applied here because the new facts show that *Scott II* was clearly erroneous and, if allowed to stand, would be manifestly unjust. *See Philadelphia Litig.,* 158 F.3d at 718. However, for the reasons stated above, the decision of the *Scott II* Court was a legal determination about the lack of adequate notice to the IRS in the 1996 Plan and 1996 Disclosure Statement. Additional facts in the record before this Court do not alter this legal conclusion and do not render the decision "clearly erroneous" or "manifestly unjust."

#### (d) *Other defenses*

■ Because the *Scott II* Court's decision regarding the lack of reasonable notice given to the IRS is the law of the case, other defenses raised by the Defendants that are grounded on the Government's failure to object to the 1996 Plan—in particular, waiver, equitable estoppel, and laches—must also be rejected.

■ The Defendants further claim that the Government's proceeding should be barred by the doctrine of unclean hands,

arguing that the Government (i) presented an incomplete and highly misleading picture to the Connecticut Courts regarding its activity in the 1996 Bankruptcy Case; and (ii) failed to disclose that the IRS's internal manuals required the employees to review all versions of disclosure statements and plans to determine whether they raise pre-confirmation or post-confirmation tax problems.

■■■■ "To prevail on an 'unclean hands' defense, the defendant must show fraud, unconscionability, or bad faith on the part of the plaintiff." *Sonowo v. U.S.*, 2006 WL 3313799, 3 (D.Del. Nov. 13, 2006) citing *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 377 n. 7 (3d Cir.1992). The Third Circuit Court of Appeals has recognized that "the primary principle guiding application of the unclean hands doctrine is that the alleged inequitable conduct must be connected, *i.e.*, have a relationship, to the matters before the court for resolution." *New Valley Corp. v. Corporate Prop. Assoc. 2 and 3 (In re New Valley Corp.)*, 181 F.3d 517, 525 (3d Cir.1999). "As an equitable doctrine, application of unclean hands rests within the sound discretion of the trial court." *Id.*

This record does not reflect conduct that would support a finding of fraud, unconscionability or bad faith by the IRS in *Scott II.* Further, the *Scott II* Court's decision of inadequate notice was not based upon the actions or inactions of the IRS, but upon the 1996 Plan documents' failure to provide full and fair disclosure.

### 2. Bankruptcy Code § 1144

■■■ The Defendants also contend that the Government's adversary proceeding is a collateral attack to revoke the order confirming the 1996 Plan which, pursuant to Bankruptcy Code § 1144, is untimely. Bankruptcy Code § 1144 provides:

On the request of a party in interest *at any time before 180 days after the date of the entry of the order of confirmation*, and after notice and a hearing, the court may revoke such order if and only if such order was procured by fraud. An order under this section revoking an order of confirmation shall—

(1) contain such provisions as are necessary to protect any entity acquiring rights in good faith reliance on the order of confirmation; and

(2) revoke the discharge of the debtor.

11 U.S.C. § 1144 (emphasis added).[30] "While on its face, § 1144 appears to apply only to express efforts to revoke a confirmation order, courts have applied the bar in § 1144 when the complaint in question appears 'to do indirectly what [the plaintiffs] no longer may do directly' because of that statutory bar." *In re Genesis Health Ventures, Inc.*, 340 B.R. 729, 733 (D.Del. 2006). In *Genesis*, the plaintiffs (consisting of 275 former debenture holders of the debtor, Genesis Health Ventures ("Genesis")) alleged that Genesis and non-debtor co-defendants committed fraud or made grossly negligent misrepresentations to the plaintiffs regarding the value of Genesis during the bankruptcy case. *Id.* at 731.

---

**30.** Like the *res judicata* defense, the Government contends that this issue was already decided against the Defendants and the law of the case bars them from re-arguing the § 1144 issue. In an opinion denying the Indenture Trustee's Motion for Summary Judgment, Judge Walsh commented that "[t]he [Government] does not assert that §§ 1127 and 1144 are implicated here. I agree they are not." *United States v. State Street Bank and Tr. Co.*, 303 B.R. 35, 40 n. 6. (Bankr. D.Del.2003). Hence, Judge Walsh's comment was not a determination of whether the instant adversary proceeding is an attempt to revoke the confirmation order.

The District Court held that the Bankruptcy Court did not commit error when it dismissed the claim against the debtor, but remanded the case to determine whether the claims asserted against the non-debtor co-defendants were "independent" and not barred by § 1144. *Id.* The *Genesis* Court wrote:

A claim is not independent where it is simply an attempt to redivide the pie by a disgruntled participant in the Plan. An independent cause of action can be maintained, however, at least where the alleged fraud could not have been asserted in the bankruptcy proceedings, the underlying factual claims were not actually adjudicated, and the relief sought would not upset the confirmed plan of arrangement.

*Id.* at 733 (citations and internal quotations omitted). On remand, the bankruptcy court in Genesis held that § 1144 did not bar the fraud claims against the non-debtor co-defendants, noting: "there ought to be a remedy to redress the harms suffered and a mechanism to divest the alleged tortfeasors of their ill-gotten gains, at least where doing so would not affect innocent parties." *In re Genesis Health Ventures, Inc.,* 355 B.R. 438, 445 (Bankr.D.Del.2006).

The Government was not a plan participant in the 1996 Bankruptcy Case. The Government did not name Scott Cable as a defendant to its action (although it later intervened) and, further, is not trying to "redivide" the pie created by the 1996 Plan. The Government's claims contest the priority of payments among competing creditors in the 1998 Bankruptcy Case. As discussed above, the Connecticut District Court has held that the Government did not have adequate notice of the 1996 Plan's possible future effect on its pecuniary interests and, therefore, the matter was not adjudicated as part of the confirmation of the 1996 Plan.[31]

■ Moreover, the relief sought by the Government does not disturb the 1996 Plan distributions to any plan participants. The confirmed 1996 Plan constitutes an enforceable contract between Scott Cable and its creditors, equity security holders and others. *See In re Accuride Corp.,* 439 B.R. 364, 367 (Bankr.D.Del.2010) citing 11 U.S.C. § 1141(a). The Debtors complied with that contract by distributing Junior PIK Notes to the 1993 Junior Noteholders and the Public Debenture Holders. The Government's current challenge to the Junior PIK Noteholders' liens is similar to challenging a pre-bankruptcy security agreement granted by a debtor to a secured creditor. Because this adversary proceeding involves a 1998 plan participant questioning priorities under the 1998 Plan, I conclude that Bankruptcy Code § 1144 is not applicable.[32]

**31.** The Defendants argue that the Government was a party in interest to the 1996 Bankruptcy Case and, therefore, subject to the 180–day limitation of § 1144. The Government argues that it was not a party in interest to the 1996 Bankruptcy Case. However, even assuming (without deciding) that the Government was a "party in interest," I conclude that § 1144 is not applicable here.

**32.** The decision *Medallion Knitwear, Inv. v. Parkdale Mills, Inc. (In re Crown–Globe, Inc.),* 107 B.R. 60 (Bankr.E.D.Pa.1989) appears to have similarities to the current adversary, but can be distinguished. In *Crown–Globe,* an unsecured creditor brought an action against a secured creditor alleging that the secured creditor failed to liquidate the debtor's assets properly and, as a result, the assets remaining for distribution to unsecured creditors was diminished by at least $450,000.00. The Court allowed claims for conversion, breach of a third-party beneficiary contract, intentional misrepresentation and negligent misrepresentation to proceed against the secured creditor, but dismissed the claim for equitable subordination, deciding that the equitable subordination claim was an untimely attempt

### 3. *Equitable Mootness*

The Defendants next argue that the Government's claims are equitably moot, since it would be inequitable to reverse all of the distributions made pursuant to the order confirming the 1996 Plan. The Government reiterates that the relief it seeks does not include revoking the 1996 Plan confirmation order or undoing transactions made to other classes of creditors under the 1996 Plan.

The equitable mootness doctrine states that an action should "be dismissed as moot when, even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable." *In re Continental Airlines, Inc.*, 91 F.3d 553, 559 (3d Cir.1996) (*"Continental I "*). "Equitable mootness ... does not ask whether a court can hear a case, but whether it should refrain from doing so because of the perceived disruption and harm that granting relief would cause." *Samson Energy Resources Co. v. Semcrude, L.P. (In re Semcrude, L.P.)*, 728 F.3d 314, 316 (3d Cir.2013). "[E]quitable mootness is most often applied in the context of an appeal, but it applies with equal force to actions brought to revoke a plan of reorganization." *Almeroth v. Innovative Clinical Solutions, Ltd. (In re Innovative Clinical Solutions, Ltd.)*, 302 B.R. 136, 141 (Bankr.D.Del.2003).

The Third Circuit has decided that an equitable mootness analysis should consider (i) whether a confirmed plan has been substantially consummated; and (ii) if so, whether granting the relief requested in the appeal will (a) fatally scramble the plan and/or (b) significantly harm third parties who have justifiably relied on plan confirmation. *Semcrude*, 728 F.3d at 321. The Defendants argue that the 1996 Plan was substantially consummated and that it is too late to "unscramble the egg" and all of the transactions completed years ago with a number of parties not before this Court. The Defendants also assert that application of the equitable mootness doctrine is particularly relevant in this matter to preserve of the finality of confirmation orders.

The relief sought in this adversary proceeding is not barred by the equitable mootness doctrine. As discussed above, the Government's claims do not seek to unravel the entirety of distributions made pursuant to the 1996 Plan. The outcome of this adversary affects the lien given to one series of notes issued under the 1996 Plan, and the holders of those notes are Defendants before the Court, or received notice and an invitation to intervene in this proceeding. *Semcrude*, 728 F.3d at 321 (If a plan is substantially consummated, a court should next consider "whether granting relief will require undoing the plan as opposed to modifying it in a manner that does not cause its collapse.") The equities in this case do not favor dismissal.[33]

---

to revoke confirmation of the debtor's plan because "it attempts to shift priority of claims as they are to be paid under the debtor's confirmed plan." *Id.* at 62. Unlike this case, both parties in the *Crown–Globe* action were creditors receiving distributions under the *Crown–Globe* plan, and the dismissed claim would have directly altered the plan's distribution of the estate assets. Here, the Government did not receive any distribution under the 1996 Plan. Instead, the Government challenges the competing claims to distribution of

the sale proceeds obtained in the later 1998 Bankruptcy Case.

**33.** This matter is more closely analogous to the reasoning of a later *Continental* decision, in which former shareholders challenged the release in the debtor's plan that barred the shareholders' claims against former officers and directors. *Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203 (3d Cir.2000) (*"Continental II "*). A "Tripartite Settlement" among the debtors, the officers and directors and their insurers

#### 4. Standing

██ The Defendants next argue that the Government lacks standing to bring the instant proceeding, arguing that claims for recharacterization or equitable subordination are generally brought by a debtor or other estate representative. *See Bezanson v. Bayside Enter., Inc. (In re Medomak Canning)*, 922 F.2d 895, 902 (1st Cir.1990) ("The Trustee is ordinarily the appropriate party to seek equitable subordination on behalf of the estate and unsecured creditors. Generally, an unsecured creditor may assert equitable subordination only where the Trustee has refused to do so and the court grants an unsecured creditor leave to contest a claim.") The Defendants point out that the Government did not seek permission to pursue its claims.

The Government argues, in response, that an individual creditor may bring an action for equitable subordination under Bankruptcy Code § 510(c) which, unlike §§ 544(b), 545, 547, 548 and 549, does not grant such powers to a trustee. *See Matter of Vitreous Steel Products Co.*, 911 F.2d 1223, 1231 (7th Cir.1990) (deciding that a creditor has standing under § 510(c) since, in some instances, equitable subordination will not benefit all unsecured creditors equally.)

At this point in the litigation, however, a chapter 7 trustee has been appointed and has joined the litigation as a plaintiff. The standing argument is rejected as moot.

I conclude that the Defendants' threshold defenses and objections have no merit and, therefore, I will consider the Government's claims for recharacterization and equitable subordination.

#### B. Recharacterization

██ The recharacterization of debt to equity is a fact-specific inquiry, and many courts have relied upon multi-factor tests to analyze the issue. *SubMicron*, 432 F.3d at 455–56. Often the tests are borrowed from tax cases seeking to recharacterize debt as equity for tax liability purposes, such as the 11–factor test used by the Sixth Circuit Court of Appeals.[34] *Id.* at 455, n.8 citing *Roth Steel Tube Co. v. Comm'r*,

---

was approved by the Court—without objection—prior to confirmation. The shareholders objected to plan confirmation, which incorporated the Tripartite Settlement and an expanded release, but the objection was overruled by the Bankruptcy Court. The District Court affirmed, finding that the shareholders did not object to or appeal the Tripartite Settlement and deciding that the settlement was a key element of the plan. *Continental II*, 203 F.3d at 208. When the matter was appealed to the Third Circuit, the Third Circuit determined that the appeal was not equitably moot because the shareholders' appeal, if successful, would not necessitate the reversal of the entire plan of reorganization. *Id.*, 203 F.3d at 210. Further, in balancing the policy favoring finality against other equities in the case, including that the shareholders "never had their day in court," the Third Circuit determined that the equities did not dictate dismissal for equitable mootness. *Id.*, 203 F.3d at 211.

**34.** The 11–factor test used by the Sixth Circuit includes: (1) the names given to the instruments, if any evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments. *Roth Steel Tube*, 800 F.2d at 630. *See also In re Exide Tech., Inc.*, 299 B.R. 732, 741 (Bankr. D.Del.2003).

800 F.2d 625 (6th Cir.1986); *Bayer Corp. v. Masco Tech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726 (6th Cir.2001). The Eleventh and Fifth Circuits have identified a 13–factor test.[35] *SubMicron*, 432 F.3d at 455, n.8 citing *Stinnett's Pontiac Serv., Inc. v. Comm'r*, 730 F.2d 634, 638 (11th Cir.1984); *Estate of Mixon v. United States*, 464 F.2d 394, 402 (5th Cir.1972). The District Court in *SubMicron* relied on a seven-factor test.[36] *SubMicron*, 432 F.3d at 456. In this case, the Government, never at a loss for exhaustive arguments, asks the Court to rely upon its proposed 23–factor test, drawn from a variety of decisions on recharacterization in both the bankruptcy and tax arenas.[37]

The Third Circuit recognized that the multi-factor tests include pertinent factors, but determined that "[n]o mechanistic scorecard suffices" for a recharacterization inquiry. *SubMicron*, 432 F.3d at 456. Instead, the Third Circuit decided that:

> [The factors] devolve to an overarching inquiry: the characterization as debt or equity is a court's attempt to discern whether the parties called an instrument one thing when in fact they intended it

**35.** The Eleventh and Fifth Circuits' 13–factor test includes: (1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a fixed maturity date; (3) the source of payments; (4) the right to enforce payment of principal and interest; (5) participation in management flowing as a result; (6) the status of the contribution in relation to regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) source of interest payments; (11) the ability of the corporation to obtain loans from outside lending institutions; (12) the extent to which the advance was used to acquire capital assets; and (13) the failure of the debtor to repay on the due date or to seek a postponement. *Stinnett's Pontiac*, 730 F.2d at 638.

**36.** The seven-factor test considers: (1) the name given to the instrument; (2) the intent of the parties; (3) the presence or absence of a fixed maturity date; (4) the right to enforce payment of principal and interest; (5) the presence or absence of voting rights; (6) the status of the contribution in relation to regular corporate contributors; and (7) certainty of payment in the event of the corporation's insolvency or liquidation. *Cohen v. The KB Mezzanine Fund, II, L.P. (In re SubMicron Sys. Corp.)*, 291 B.R. 314, 323 (D.Del.2003) quoting *In re Color Tile, Inc.*, 2000 WL 152129, *4 (D.Del. Feb. 9, 2000).

**37.** The Government's proposed 23–factor test includes: (1) whether new money was supplied for the security; (2) identity between creditors and shareholders; (3) extent of participation in, or influence over, management by the holder of the instrument at issue; (4) voting power of the holder of the instrument; (5) ratio of debt to equity in the capital structure and the "thinness" of the of the equity within the capital structure; (6) whether the advance was contributed by shareholders in proportion to their stock interests; (7) formal indicia of the investment; (8) provision of a fixed rate of interest; (9) presence or absence of a meaningful, fixed maturity date; (10) relative position of the obligees as to other creditors regarding the payment of interest and principal; (11) whether repayment of the advance was subordinated to the repayment of other obligations; (12) presence or absence of security for the obligation, the value of the collateral, and the amount of that value committed as a security to more senior obligations; (13) right to enforce the payment of the obligation in the event of default and whether the right is realistically enforceable; (14) source of payment of interest and principal; (15) whether a sinking fund was maintained to pay the obligation; (16) whether an outside lender would have made the same advance under the same or similar terms; (17) risk involved in the investment; (18) whether the purported loan was held out to others as a contribution of capital or equity; (19) whether the advance was used to acquire the company or to purchase capital assets or to pay operating expenses; (20) contingency on the obligation to repay; (21) whether postponement of the obligation was obtained; (22) whether the alleged debt was repaid per its term or repaid at all; and (23) intent of the parties.

as something else. *That intent may be inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances.* Answers lie in facts that confer context case-by-case.

. . . .

Which course a court discerns is typically a commonsense conclusion that the party infusing funds does so as a banker (the party expects to be repaid with interest no matter the borrower's fortunes; therefore the funds are debt) or as an investor (the funds infused are repaid based on the borrower's fortunes; hence, they are equity). Form is no doubt a factor, but in the end it is no more than an indicator of what the parties actually intended and acted on.

*SubMicron*, 432 F.3d at 456 (emphasis added). *See also Friedman's Liquidating Trust v. Goldman Sachs Credit Partners, L.P. (In re Friedman's Inc.)*, 452 B.R. 512, 519 (Bankr.D.Del.2011) (reading SubMicron to require a recharacterization analysis to focus on the overarching inquiry of the parties' intent, rather than a multi-factor test).

The Government seeks to recharacterize the Junior PIK Notes as equity and asks the Court to consider the facts surrounding the issuance of those notes upon confirmation of the 1996 Plan. The Defendants disagree, however, and assert that the Court should review the circumstances occurring at the outset of the financial relationship between the parties which, for the Series A Junior PIK Notes, was initial issuance of the Junior Notes as part of the 1988 LBO, and, for the Series B Junior PIK Notes, was the issuance of the Public Debentures.

■ In *SubMicron*, the Third Circuit determined that "the focus of the recharacterization inquiry is whether 'a debt actual-

ly exists,' . . . or, put another way, we ask *what is the proper characterization in the first instance of an investment.*" *SubMicron*, 432 F.3d at 454 quoting *AutoStyle Plastics*, 269 F.3d at 748 (emphasis added). In this context, the *SubMicron* Court noted, the term *re* characterization is actually misleading. *Id.* at n. 7 citing *Citicorp Real Estate, Inc. v. PWA, Inc. (In re Georgetown Bldg. Assocs. Ltd P'ship)*, 240 B.R. 124, 137 (Bankr.D.D.C.1999) ("The debt-versus-equity inquiry is not an exercise in *recharacterizing* a claim, but of *characterizing* the advance's true character.") (emphasis in original); *In re Cold Harbor Assocs., L.P.*, 204 B.R. 904, 915 (Bankr. E.D.Va.1997) ("Rather than recharacterizing the exchange from debt to equity, . . . the question before this Court is whether the transaction created a debt or equity relationship from the outset."). Accordingly, in characterizing an instrument as debt or equity, a court must focus its inquiry to a point at the very beginning of the parties' relationship. *See AutoStyle*, 269 F.3d at 748–49 ("Recharacterization is appropriate where the circumstances show that a debt transaction was actually an equity contribution *ab initio*") (internal quotations omitted).

The Government argues that the Junior PIK Notes issued pursuant to the 1996 Plan were an entirely new transaction between the parties because, unlike the 1993 Restructuring that simply amended an already-existing agreement, the 1996 Plan provided creditors with a new instrument subject to a new agreement. In those terms, the Government is correct, but only in form, not substance.

■ Consistent with the Court's direction in *SubMicron*, I conclude that a recharacterization analysis of the 1996 Junior PIK Notes must be considered in light of the entire relationship of the par-

ties, with particular emphasis on parties' intent at the initial funding. For the Series A Junior PIK Notes, the focus of the recharacterization analysis is on the initial issuance of the Junior Notes as part of the 1988 LBO. For the Series B Junior PIK Notes, the recharacterization analysis will focus on the issuance of the original Public Debentures. There has been no challenge to the characterization of the original Public Debentures as debt of Scott Cable. Therefore, I conclude that the Government's claim for recharacterization of the Series B Junior PIK Notes must be denied. The remaining recharacterization analysis will be limited to the Series A Junior PIK Notes. As directed by *SubMicron* decision, the recharacterization analysis seeks to divine the parties' true intent at the outset of the parties' relationship, *i.e.*, the issuance of the 1988 Junior Notes, by considering pertinent factors found in the multi-factor tests, particularly the parties' contract, actions and the economic reality of the circumstances surrounding the 1988 LBO.

### 1. *The Parties' Contract*

The 1988 Junior Notes and the Junior Note Agreement included many provisions that are typical for debt instruments. The 1988 Junior Notes had a fixed maturity date and fixed rate of interest. The Junior Note Agreement specified a number of events of default. Should certain events of default occur, the Junior Note Agreement provided that the notes immediately became due and payable and the Junior Noteholders could exercise all rights and remedies provided for in the Notes, the Junior Note Agreement or at law or equity. The Junior Note Agreement also restricted some of Scott Cable's actions; for example, Scott Cable's ability to incur future debt or future liens, to enter into any transaction of merger, acquisition or consolidation, or to enter into

certain transactions with any officer, director or shareholder—all of which are ordinary protections for a lender.

■ The documents also include provisions that sometimes tend to indicate funding is equity, rather than debt. For example, the 1988 Junior Notes deferred payment of interest until maturity. *Compare Off'l Comm. v. Highland Capital Mgmt. L.P. (In re Moll Indus., Inc.)*, 454 B.R. 574, 582 (Bankr.D.Del.2011) (a transaction that defers repayment of interest indicates a transaction may be intended as equity) with *AutoStyle*, 269 F.3d at 750–51 (deferral of interest payments on its own does not prove the parties intended the debt transaction to be equity). In addition to payment of interest at a fixed rate, the 1988 Junior Notes had a contingency interest feature that provided for an additional payment on the notes' maturity based upon a percentage of the increase in fair market value of Scott Cable, if any, but the contingent interest was capped at a certain amount. Courts have also viewed the absence of a sinking fund for repayment to be evidence that funds were capital contributions. *AutoStyle*, 269 F.3d at 753. Furthermore, an agreement to subordinate repayment of funds to claims of all other creditors indicates that advances were equity, rather than debt. *AutoStyle*, 269 at 752.

■ The general form and overall content of the 1988 Junior Notes and the Junior Note Agreement weigh in favor of finding that the Junior Notes represent *debt* of Scott Cable. The deferred interest rate and subordination provisions indicate that the Noteholders were understood to be at the end of the line, but that they expected repayment pursuant to fixed terms on or before the maturity date. Even the contingency interest feature supports this finding—rather than tying re-

payment of the Notes to an uncertain future date based on the fortunes of the business, the contingency interest provides extra payment on the fixed maturity date—only the *amount* of the extra payment is contingent. *See AutoStyle,* 269 F.3d at 751 (deciding that if repayment depended *solely* on the success of the borrower's business, the transaction has the appearance of an equity contribution). The 1988 Junior Notes were subordinated and risky and, as a practical matter, repayment depended on the success of the new owner's plan to boost performance and increase revenues. However, all extensions of credit depend on a company's success, and that risk alone—without more—does not indicate that they are capital contributions. *Joseph v. Feit (In re Liberty Brands, LLC),* No. 07–10645, Adv. No. 09–50965, 2014 WL 4792053, *4 (Bankr.D.Del. Sept. 25, 2014).

## 2. The Parties' Actions

The Government argues that the Defendants' actions contradicted any "debt" provisions in the documentation. For example, despite being labeled as "notes," there is evidence that internal reports of the noteholders or of consultants to Scott Cable included the 1988 Junior Notes (and the 1993 Junior Notes) in categories labeled "equity" or "equity and equivalents." These internal reports are not controlling on this issue. Documentation available to outsiders, for example the annual Deloitte & Touche, LLP audited financials, always included the 1988 Junior Notes under "Notes and Loans Payable."

██ The Government also argues that the maturity date in the 1988 Junior Notes was meaningless, since it was continually extended without payment. A willingness to postpone repayment of the indebtedness has been viewed by some courts as a characteristic of equity. *See Slappey Drive Ind. Park v. U.S.,* 561 F.2d 572, 582 (5th Cir.1977) (Failure to insist upon timely repayment or satisfactory renegotiation indicates an expectation to recover more than the announced interest rate); *Flint Indus., Inc. v. Comm'r,* 82 T.C.M. (CCH) 778, 2001 WL 1195725, * 12 (U.S. Tax Ct.2001) ("Evidence that a creditor did not intend to enforce payment or was indifferent as to the exact time the advance was to be repaid belies an arm's-length debtor-creditor relationship"); *Aquino v. Black (In re AtlanticRancher, Inc.),* 279 B.R. 411, 437 (Bankr.D.Mass.2002) (Despite proper documentation, the creditor never made any effort to collect the note, thus treating it as an investment).

In the above cases, the creditors *chose* not to collect the indebtedness, waiting instead until the company had "plenty of cash" (*Slappey,* 561 F.2d at 582) or deciding not to foreclose and collect, because doing so would put the company out of business (*AtlanticRancher,* 279 B.R. at 437). In this case, the evidence shows that demanding payment at the point of maturity would have been futile since Scott Cable had insufficient funds or value available to pay the subordinated debt. At that point, the Defendants had only a Hobson's Choice: extend the maturity date and possibly recover funds in the future or force a liquidation and, most likely, receive no payment. The evidence in this case also shows that—at the time the 1988 Junior Notes were issued—Simmons Communications and the 1988 Junior Noteholders expected that internal changes would increase the Company's revenues and allow the 1988 Junior Noteholders to obtain full payment on the Notes in four to eight years. Outside forces, such as increased regulation of cable companies in 1992, prevented the parties from realizing that goal.

██ The Government also argues that evidence demonstrated that the Junior

Noteholders (later, the Series A Holders) had influence over management and participated in Scott Cable's board decisions, thus indicating that the Junior Notes were capital contributions. "If a creditor receives a right to participate in the management of a business in consideration for an advance to the business, such participation tends to demonstrate that the advance was not a bona fide debt but rather was an equity investment." *Flint*, 2001 WL 1195725 at * 13. The Government points out that some of the larger 1988 Junior Noteholders, namely, MC Partners and Allstate, obtained shareholder interests in Scott Cable as part of the 1988 LBO. However, the stock acquired in the 1988 LBO was Class B non-voting stock. The evidence showed that the Scott Cable's management had frequent communications with the Junior Noteholders, particularly Mr. Churchill of T.A. Associates. Scott Cable provided extensive financial information and discussed strategies for repayment with Mr. Churchill. However, none of these activities show involvement in the day-to-day business operations of Scott Cable. *Cf. AtlanticRancher*, 279 B.R. at 435–36 (deciding a transaction was equity when holder of convertible promissory note had "extraordinary ability to direct the company's affairs" and "was extremely involved in the daily operations of the [d]ebtor"). The Junior Noteholders did not have the right to elect a member to Scott Cable's board until confirmation of the 1996 Plan. As recognized in *SubMicron*, it is not unusual for lenders to participate on a company's board, particularly when the company is distressed. *SubMicron*, 432 F.3d at 457–58; *Off'l Comm. v. Tennenbaum Capital Partners, LLC (In re Radnor Holdings Corp.)*, 353 B.R. 820, 839–40 (Bankr.D.Del.2006).

 The Government claims that the 1993 and 1996 Management Incentive Agreements created an identity of interest between management and the Junior Noteholders/Series A Holders. Court have considered "identity of interest" as a sign of equity when there is an exact correlation between the ownership interests of the equity holders and their proportionate share of the alleged loan. *AutoStyle*, 269 F.3d at 751. Here, there was no such proportionality. "Identity of interest" also occurs when the interests of the shareholder/lenders and the corporation are so entwined that an arm's-length relationship is unlikely. *Fin Hay Realty Co. v. United States*, 398 F.2d 694, 698 (3d Cir.1968). Any identity of interest created by the Management Incentive Agreements did not exist at the outset of the parties' relationship.

Overall, the conduct of the Junior Noteholders is consistent with creditors who seek repayment of a debt. As the Company's finances became distressed, the Junior Noteholders actively sought more information and input to prevent the indebtedness from being wiped out. The subordinated position of the Junior Noteholders caused them to fall within a number of factors that are usually identified with equity, but the Court's job is to evaluate the factors, not just count them. I conclude that the Junior Noteholders' conduct throughout the parties' relationship is consistent with that of a lender—albeit a subordinated lender with no security.

### 3. *The Economic Reality of the Surrounding Circumstances*

 To determine whether a transaction is debt or equity, a court should also consider the economic circumstances in which the funds were provided to the company. Courts may question whether a prudent lender would have extended credit to the debtor under similar circumstances. *Moll Indus.*, 454 B.R. at 584. *See also*

*AutoStyle,* 269 F.3d at 752 ("When there is no evidence of other outside financing, the fact that no reasonable creditor would have acted in the same manner is strong evidence that the advances were capital contributions rather than loans.") This case did not involve a typical lending scenario, but rather an LBO which occurred after a competitive process. Scott Cable had other proposals, but selected the deal with Simmons Communications since it had more favorable terms and a higher per share price. The competitive process indicates that other purchasers were interested in the company, even though the terms may not have been as favorable.

■■■■■ In a debt/equity analysis, courts also consider whether the debtor was undercapitalized when the transaction took place. The Government argues that the Junior Noteholders held equity, not debt, because Scott Cable was undercapitalized when the Junior Noteholders initially obtained their notes upon completion of the LBO, and Scott Cable remained severely undercapitalized through the issuance of the Junior PIK Notes as part of the 1996 Plan. "[W]hen a corporation is undercapitalized, a court is more skeptical of purported loans made to it because they may in reality be infusions of capital." *SubMicron,* 432 F.3d at 457 quoting *AutoStyle,* 269 F.3d at 746-47. *See also Flint,* 2001 WL 1195725 at * 14 ("Inadequate or 'thin' capitalization is strong evidence of a capital contribution where: (1)[t] he debt-to-equity ratio was initially high; (2) the parties realized that it would likely go higher; and (3) substantial portions of these funds were used for the purchase of capital assets and for meeting expenses needed to commence operations.") Courts will also examine the proposed source for repayment of interest and principal to a lender.

In general, there are four possible sources: (1) liquidation of the business' assets, (2) profits, (3) cash flow, and (4) refinancing with another lender. "If repayment of the advances can only be reasonably assured by the chance of profits or from the liquidation of the business, the money is at the risk of the venture." *Scriptomatic, Inc. v. U.S.,* 397 F.Supp. 753, 764 (E.D.Pa.1975). If, however, *under the circumstances at the time of the advances,* a prudent investor would have had a realistic and reasonable expectation of an adequate cash flow or the presence of outside financing which would enable repayment to be made under the terms of the advance, economic reality would dictate that a valid debt had been created.

*Fischer v. U.S.,* 441 F.Supp. 32, 39 (E.D.Pa.1977) (emphasis added).

In this case, the record shows that Scott Cable was thinly capitalized after the LBO and the Proxy Statement filed in connection with the transaction noted that the Company needed to improve its operations and cash flow "significantly above historic levels" to meet its obligations. However, the evidence also shows that the parties expected that Scott Cable would experience a growth in system revenue and cash flow to enable the Junior Noteholders to receive payment within four to eight years of the LBO. There was evidence that Scott Cable enjoyed an increase in revenues for a short period post-LBO, but changes in regulations related to the banking and cable industries caused the Company to lose value, jeopardizing payment of subordinated creditors, like the Junior Noteholders.

### 4. *Recharacterization Conclusion for the 1988 Junior Notes*

The facts surrounding the issuance of the 1988 Junior Notes as part of the LBO leads me to conclude that the parties in-

tended the Junior Notes to be debt of Scott Cable. The documentation for the Junior Notes and the conduct of the Junior Noteholders reveal an intent to be repaid a fixed amount within a reasonable period of time. Other third-parties were also making offers to acquire Scott Cable in 1988. At that time, the parties reasonably projected that the revenues and cash flow of the Company would increase and be sufficient to repay the indebtedness.

### 5. Recharacterization Conclusion for the 1996 Junior PIK Notes

██ The issuance of the Junior PIK Notes in 1996 cannot be viewed as an entirely new transaction, but as a continuance of the Junior Note indebtedness that had its genesis in the 1988 LBO. The Junior PIK Notes reflect all indicia of indebtedness, including the issuance of notes with payment at a fixed interest rate (although payment of interest was deferred) and a maturity date of five years and seven months after the 1996 Plan's effective date. Moreover, issuance of the Junior PIK Notes was accompanied by the grant of a security interest. On the other hand, the holders of the Junior PIK Notes were also given Class B Common Stock and the ability to elect one member to the Board of Directors. The liquidity crisis faced by Scott Cable in 1996 was clear and known to the parties. The liquidation analysis attached to the final 1996 Plan projected no recovery for Junior Noteholders in the event of a liquidation.

The Government argues that a multi-factor recharacterization analysis supports its position that the 1996 Junior PIK Notes should be characterized as equity issued by the reorganized Scott Cable, rather than debt. However, in *SubMicron* the Third Circuit decided that it was appropriate to review later advances by an existing lender in light of the ongoing relationship and recognizing that "when existing lenders make loans to a distressed company, they are trying to protect their existing loans and traditional factors that lenders consider (such as capitalization, solvency, collateral, ability to pay cash interest and debt capacity ratios) do not apply as they would when lending to a financially healthy company." *SubMicron*, 432 F.3d at 457 quoting the District Court *SubMicron* opinion, 291 B.R. at 325. This rationale has been followed in subsequent recharacterization cases. *Moll Indus.*, 454 B.R. at 583–84 (citing *SubMicron*); *Radnor Holdings*, 353 B.R. at 839 (same).

The Series A Junior PIK Noteholders had the ability to elect one member of a five-member board for reorganized Scott Cable, which is not enough to control the Company. However, the Series B Junior PIK Noteholders (who were also the Senior PIK Noteholders) had the ability to elect two members to reorganized Scott Cable's five-member board. Presumably, then, the Series A Holders and Series B Holders, together, could control reorganized Scott Cable's board. However, the *SubMicron* Court determined that an existing lender's participation on the board of a distressed company after its loan is in jeopardy does not support an equity characterization. *SubMicron*, 432 F.3d at 457–58. *See also Radnor Holdings*, 353 B.R. at 839–40.

Overall, the circumstances surrounding the issuance of the Junior PIK Notes in the 1996 Plan, especially when viewed in light of the parties' prior debt relationship, indicate that the Junior PIK Notes remained debt. The Government's claim for recharacterization of the Series A and Series B Junior PIK Notes will be denied.

### C. Equitable Subordination

██ Alternatively, the Government asks the Court to equitably subordinate

the Junior PIK Noteholders' secured claim to the administrative claims of federal and state taxing authorities for purposes of distributing the proceeds from the 1998 sale of Scott Cable to Interlink. Equitable subordination is a remedy provided in Bankruptcy Code § 510(c), which states:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c). The Third Circuit has described equitable subordination as "a 'remedial rather than penal' doctrine designed 'to undo or to offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results.'" *Schubert v. Lucent Tech., Inc. (In re Winstar Commc'n, Inc.),* 554 F.3d 382, 411 (3d Cir.2009) quoting *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims,* 323 F.3d 228, 233–34 (3d Cir.2003). Courts have further described § 510(c) as follows:

For purposes of distribution, Section 510(c) permits a bankruptcy court to subordinate an allowed claim, on equitable grounds, to the claims of other creditors of a debtor's estate. "In the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankruptcy estate."

*In re Mid–American Waste Sys., Inc.,* 284 B.R. 53, 68 (Bankr.D.Del.2002) quoting *Burden v. United States,* 917 F.2d 115, 117 (3d Cir.1990) in turn, quoting *Pepper v. Litton,* 308 U.S. 295, 307–08, 60 S.Ct. 238, 245–46, 84 L.Ed. 281 (1939).

The party seeking to subordinate a claim has the initial burden of coming forward with material evidence to overcome the prima facie validity accorded to proofs of claim. *Mid-American Waste,* 284 B.R. at 69. Then, the burden shifts to the claimant to demonstrate the fairness of its conduct. *Id.* The burden on the claimant is not only to prove the good faith of the parties to the transaction, but also to show the inherent fairness from the point of view of the debtor corporation and those with interests therein. *Id.*

In *Winstar,* the Third Circuit adopted the widely-used three-factor test that must be satisfied before deciding whether equitable subordination of a claim is appropriate: (1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in an injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must be consistent with the provisions of the Bankruptcy Code. *Winstar,* 554 F.3d at 411 (internal punctuation omitted) quoting *Benjamin v. Diamond (In re Mobile Steel Co.),* 563 F.2d 692, 699–700 (5th Cir.1977). *See also, e.g., In re Sentinel Mgmt. Group, Inc.,* 728 F.3d 660, 669 (7th Cir.2013) (citing three-factor test); *Henry v. Lehman Commercial Paper, Inc. (In re First Alliance Mortg. Co.),* 471 F.3d 977, 1006 (9th Cir. 2006) (same); *Estes v. N & D Prop., Inc. (In re N & D Prop., Inc.),* 799 F.2d 726, 731 (11th Cir.1986) (same).

In this case, the facts surrounding the grant of security interests to the Series A and the Series B Junior PIK Noteholders

are not identical. Therefore, a separate equitable subordination analysis must be undertaken for each sub-group.

### (1) *The Series A Junior PIK Noteholders*

#### (a) *Inequitable Conduct*

 The type of misconduct that will satisfy the first prong varies depending on whether the alleged bad actor is an "insider" of the debtor. When the claimant is an insider, the standard for finding inequitable conduct is much lower. *Mid–American Waste*, 284 B.R. at 70. "A claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts." *Winstar*, 554 F.3d at 412 quoting *Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1465 (5th Cir.1991).

The Code defines an "insider" of a corporate debtor as including "(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor." 11 U.S.C § 101(31)(B). A party may also be considered a "nonstatutory insider," even without actual control of the debtor, when there is a close relationship between debtor and creditor and when transactions between them were not conducted at arm's length. *Winstar*, 554 F.3d at 396–97 citing *Anstine v. Carl Zeiss Meditec AG (In re U.S. Medical, Inc.)*, 531 F.3d 1272, 1277 (10th Cir.2008). *See also* 5–547 Collier on Bankruptcy ¶ 547.03[6] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. rev. 2014) ("The consideration of insider status focuses on two factors: (1) the closeness of the relationship between the parties; and (2) whether the transaction was negotiated at arm's

length.") (discussing "insider" as used in 11 U.S.C. § 547(b)(4)(B)).

 The Government urges that this Court consider the holders of the Series A Junior PIK Notes "insiders" of Scott Cable, because representatives of MC Partners and Allstate: (i) had regular communications with the management of Scott Cable to learn about the Company's financial performance; (ii) received financial information, restructuring plans and information about negotiations with other creditors from management that was not available to others; and (iii) generally provided advice to management on Scott Cable's financial affairs. Moreover, the Government contends that the 1993 and 1996 Management Incentive Agreements provided Scott Cable's management with an interest in providing for a recovery on the Junior PIK Notes that may not have always aligned with the best interests of the Company. Finally, the Government points out that, after confirmation of the 1996 Plan, the Series A Junior PIK Noteholders obtained the ability to elect a representative to Scott Cable's Board of Directors.

The Defendants argue that the Series A Holders were not insiders of Scott Cable because activities such as monitoring the Company's business and attending board meetings are not sufficient to show control over the day-to-day operations. *Radnor Holdings*, 353 B.R. at 840–41.

I agree that the Series A Holders were not statutory insiders. However, the 1993 and 1996 Management Incentive Agreements created an alignment of interests between Scott Cable's management and the Series A Holders that provided a closeness that would affect the Company's dealings with the Series A Holders and prevent a true arm's-length relationship between the entities. All of the Series A Holders (*i.e.*, MC Partners, TA Investors,

Allstate, Milk Street Partners, Chestnut Street Partners and Northeast Ventures II) were parties to the 1993 and 1996 Management Incentive Agreements. (Pl. Ex. 68 and Pl. Ex. 122.) "An arm's-length transaction is a transaction in good faith in the ordinary course of business by parties with independent interests ... [that] each acting in his or her own best interest [ ] would carry out...." *Winstar*, 554 F.3d at 399 quoting *In re U.S. Med.*, 531 F.3d at 1277 n. 4. The Management Incentive Agreements gave Scott Cable's management an incentive to act in the best interests of the Series A Holders, rather than independently. Therefore, for purposes of the equitable subordination analysis, the Series A Holders were non-statutory "insiders."

■ "Courts have generally recognized three categories of misconduct which may constitute inequitable conduct for insiders: (1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego." *Mid–American Waste*, 284 B.R. at 70. The Government argues that fraudulent transfer, illegality, aiding and abetting management's breach of fiduciary duty and undercapitalization are all pres-

ent in this case.[38] Although the granting of a lien to gain advantage over other creditors has been considered under the first category of inequitable behavior (*see Fabricators*, 926 F.2d at 1467), the foregoing categories are not exclusive in describing inequitable insider conduct. The inability to fit neatly the parties' actions within a specific heading does not make the misconduct any less inequitable.

■ *The inequitable conduct in this case was the plan between Scott Cable's management and the Series A Holders to convert the Series A Holders' subordinated unsecured debt into secured debt by issuing secured notes through the 1996 Plan for the purpose of enabling the Series A Holders to gain an unfair advantage over the IRS by preventing collection of the capital gains tax that all parties knew would arise at a later time since it was already intended that the assets of the Company were expected to be sold.*[39] The parties determined to grant this lien in the context of a chapter 11 bankruptcy plan to obtain the comfort of a confirmation order drafted by the parties that would include language to inhibit future challenges to the lien transfer. Moreover, the chapter 11 plan process allowed the parties to claim that the IRS received notice of the grant-

---

**38.** The Government argues that the transfer of the security interest to the Series A Holders was both an actual fraudulent conveyance and a constructive fraudulent conveyance. In a related decision, issued simultaneously with this one, I denied the chapter 7 Trustee's request to bring fraudulent conveyance claims against the Indenture Trustee based upon the equitable doctrine of laches (the claims were brought more than twelve years after the allegedly fraudulent transfer and nine years after the 1998 Bankruptcy Case) and collateral estoppel (I have already denied requests to assert late fraudulent conveyance claims at least three times in this adversary). The Government also argues that illegality is present in this case because the Defendants' conduct in connection with the 1996 Bankruptcy Case

amounts to bankruptcy fraud under 18 U.S.C. § 371. However, the record does not contain any indication that any criminal action was ever brought against the Defendants. *See Mid–American Waste*, 284 B.R. at 58 (plea agreements admitted into evidence showed that the debtor's CEO engaged in bribery).

**39.** *See Sentinel Mgmt.*, 728 F.3d at 669 ("Underhanded behavior is typically clearest, however, when corporate insiders have attempted to convert their equity interests into secured debt in anticipation of bankruptcy.") (internal punctuation omitted). Although this case instead involves the conversion of unsecured debt into secured debt, the result is the same.

ing of the lien and, further, blame the IRS for not discovering the scheme due to the IRS's failure to thoroughly review a disclosure statement, which contained—not direct notice—but clues scattered throughout a myriad of sections, in a case in which the IRS was not even a claimant.

The specific factual findings that support this conclusion of inequitable conduct by the Series A Holders (previously, the Junior Noteholders) are as follows:

- At the time of the 1988 LBO, Scott Cable and the Junior Noteholders knew that, due to the low tax basis in the Company's assets, a large capital gains tax would arise upon the sale of the Company's assets, which is why the parties structured the LBO as a stock sale, rather than an asset sale.

- At the time Scott Cable was considering strategies to pay the debt instruments that were due to mature in 1993, the Junior Noteholders and management knew a sale of Scott Cable's assets would not generate sufficient funds to pay all of the Company's indebtedness, particularly the Public Debentures and the Junior Notes. The Junior Noteholders and management knew that the Company had used most of its existing NOLs to offset gains received from post-LBO system sales and any further asset sales would create significant tax liabilities.

- After the 1993 Restructuring, the Junior Noteholders and management knew that offers received by the Company to purchase its assets were in the range of $95—$100 million, which were not sufficient to pay the outstanding debts, which totaled over $148 million.

- After the 1993 Restructuring, the Junior Noteholders considered the possibility that granting a lien to secure the Junior Notes would enable them to be paid prior to any capital gains tax. The Junior Noteholders began researching whether granting such a lien would create personal liability for Scott Cable's management and whether a lien could be granted in the context of chapter 11 case to resolve potential liability issues for individuals.

- Scott Cable's management and the Junior Noteholders acknowledged that a liquidation of the Company in late 1995 would not yield sufficient sale proceeds to pay all of the Company's indebtedness. The parties began discussions about a restructuring that would grant liens to the unsecured noteholders (both the Public Debentures and the Junior Noteholders) to put them in a position to be paid before any capital gains tax that would arise from a future sale of Scott Cable's assets.

- The Junior Noteholders and management recognized that the value of Scott Cable's assets was likely to increase with the enactment of the Telecommunications Act of 1996, which provided for substantial deregulation of rates charged by small system operators, such as Scott Cable. The goal of the Junior Noteholders in the 1996 Bankruptcy Case was to preserve their debt and obtain repayment from a future asset sale based on the increased value; however, the Junior Noteholders needed to obtain a lien to gain an advantage over any capital gains tax that would arise from an asset sale.

- Scott Cable obtained confirmation of the 1996 Plan, which provided for the distribution of secured Junior PIK Notes to the Junior Noteholders (Series A) and the Public Debenture Holders (Series B) that enabled those creditors to gain an advantage over the

IRS upon a future sale of the Company's assets.

The Defendants argue that there is nothing inequitable in obtaining a lien to secure repayment of indebtedness. I agree that obtaining a security interest—without more—is not inequitable conduct. *Fabricators*, 926 F.2d at 1468. However, other courts have recognized that obtaining a lien for the purpose of gaining an advantage over other creditors may be inequitable, depending on the circumstances surrounding that act. *Fabricators*, 926. F.2d at 1468 (finding misconduct, when an insider obtained liens "not merely [as] an isolated act, but one step interconnected with a series of actions by [the insider] to gain an advantage over the position of other creditors."); *Estes v. N & D Prop., Inc. (In re N & D Prop., Inc.)*, 799 F.2d 726, 732 (11 th Cir.1986) (finding misconduct based on an insider's actions to encumber the debtor's assets and obtain a priority in the impending bankruptcy proceedings was inequitable to consumer creditors); *Fluharty v. Wood Prod., Inc. (In re Daugherty Coal Co., Inc.)*, 144 B.R. 320, 327 (N.D.W.V.1992) (finding misconduct when an insider obtained liens "without going through the appropriate formalities" covering the only significant assets owned by the debtor, and effectively "leapfrogging" over other creditors); and *Rodolakis v. Chertoff (In re 1236 Dev. Corp.)*, 188 B.R. 75, 84 (Bankr.D.Mass.1995) (finding misconduct when an insider secured his capital contributions with a lien against the debtor's assets, thereby gaining an unfair advantage and harming the debtor and its creditors).

The Defendants also argue that the transaction was not inequitable because they provided value to Scott Cable in exchange for the secured Series A Junior

PIK Notes in the form of (i) agreeing to receive Junior PIK Notes in an amount that was only 85% of the amount of their allowed claim; (ii) receiving PIK interest; (iii) extending the maturity date for payment; and (iv) the tangible and intangible benefits of agreeing to a consensual plan confirmation. Based upon the evidence in the record regarding the value of the Scott Cable at the time the liens were granted, I cannot agree that the Series A Holders provided anything but minimal value to the Debtors in exchange for the secured Series A Junior PIK Notes. The Junior PIK Notes were in the total amount of the 1993 Junior Noteholders' claims, but the 1993 Junior Noteholders and the Public Debenture Holders negotiated among themselves to transfer 15% of the Junior PIK Notes to the Public Debenture Holders. Moreover, the Junior Notes had no value. At the time the 1996 Plan was being proposed and confirmed, the 1993 Junior Noteholders and management knew that the value of Scott Cable's assets was insufficient to pay anything to the 1993 Junior Noteholders. The liquidation analysis attached to the final 1996 Disclosure Statement showed that a liquidation of Scott Cable's assets, and payment of the capital gains tax, would result in no distribution on the 1993 Junior Notes. Had the IRS received adequate notice regarding the 1996 Plan's grant of a security interest to displace its ability to collect future capital gains taxes, it could have raised an objection to the 1996 Plan that would have had merit.[40]

(b) *Injury to Creditors or Unfair Advantage on the Claimant*

The second factor of the equitable subordination analysis requires a finding that the inequitable conduct resulted in an injury to creditors or unfair advantage to the

**40.** It is true, however, that the procedures employed by the IRS for the handling of the 1996 Bankruptcy Case do not show the Government at its best.

claimant. Here, the misconduct clearly resulted in both. The Government was injured by the attempted impairment of its right to an administrative tax claim based upon the less than arm's-length negotiations between Scott Management and the Series A Holders. Moreover, the scheme devised by the Series A Holders enabled them to obtain an unfair advantage over the IRS by using the 1996 Bankruptcy Case to "leap-frog" ahead of the IRS's claim.

 "A claim or claims should be subordinated only to the extent necessary to offset the harm which the bankrupt and its creditors suffered on account of the inequitable conduct." *Winstar*, 554 F.3d at 413 quoting *Mobile Steel*, 563 F.2d at 701. In some equitable subordination cases, it is difficult to quantify the harm caused by the inequitable conduct. In this case, the harm is equal to the amount of the tax claims that lost their priority. Subordinating payment of the Series A Junior PIK Notes to the unpaid administrative tax claims would offset the harm caused by the inequitable conduct.

#### (c) *Consistency with the Provisions of the Code*

The final factor in an equitable subordination analysis requires the Court to determine whether subordination of a particular claim is consistent with the Bankruptcy Code. As noted by my colleague, the Honorable Brendan Linehan Shannon:

The leading case on a court's powers under § 510(c) is *United States v. Noland*, 517 U.S. 535, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996). There, the United States Supreme Court held that "the bankruptcy court may not equitably subordinate claims on a categorical basis in derogation of Congress's scheme of priorities." *Id.* at 536, 116 S.Ct. 1524.

This means that courts are limited in their ability to reorder express statutory priorities by, for example, subordinating debt to equity. *See Winstar*, 554 F.3d at 414. But a court may subordinate the claims of creditors to other creditors. *Id.*

*Elway Co., LLP v. Miller (In re Elrod Holdings Corp.)*, 421 B.R. 700, 715–16 (Bankr.D.Del.2010). Here, the Government is asserting its rights as an administrative tax claimant in the 1998 Bankruptcy Case. Subordination of the Series A Junior PIK Notes to the administrative tax claims actually restores the priorities set by Congress by preventing otherwise subordinated unsecured debt from gaining an unfair advantage of prior payment of administrative tax claims. 11 U.S.C. § 507(a)(8).

The Defendants argue that equitable subordination of the Junior PIK Notes would be inconsistent with a number of provisions of the Bankruptcy Code: namely, §§ 1101, 1123, 1128, 1129, 1141, 1142, 1144. The Defendants ask this Court to view the adversary proceeding as an attack upon the 1996 confirmation order. For the reasons set forth earlier in this Opinion, I have already held that § 1144 is not applicable to this adversary proceeding. The Government's claims arise in the 1998 Bankruptcy Case. In 1996, the Court had no knowledge of any misconduct. When a fraudulent scheme comes to light, "the necessity of equitable relief against that fraud becomes insistent." *Pepper v. Litton*, 308 U.S. 295, 312, 60 S.Ct. 238, 248, 84 L.Ed. 281 (1939). "No matter how technically legal each step in that scheme may have been, once its basic nature was uncovered it was the duty of the bankruptcy court in the exercise of its equity jurisdiction to undo it." *Id.*

### (d) Conclusion—Equitable Subordination of the Series A Junior PIK Noteholders

The Defendants urge that this Court recognize the unfairness of applying equitable subordination in this case, since the Series A Holders received their secured claims pursuant to a chapter 11 plan that was disseminated to all interested parties (including the IRS) and approved after a hearing before the Bankruptcy Court. They argue that equitable subordination of such notes will chill investments in financially troubled entities. Equitable subordination is a "drastic" and "unusual" remedy because it means "that a court has chosen to disregard an otherwise legally valid transaction." *In re Lifschultz Fast Freight*, 132 F.3d 339, 347 (7th Cir. 1997). The Defendants also point out the Seventh Circuit's observation that:

> Wrongful or unpredictable subordination spawns legal uncertainty of a particular type: the risk that a court may refuse to honor an otherwise binding agreement on amorphous grounds of equity. If a court wrongly subordinates a claim, other investors are sure to take heed. An investor will see that the chance she might not get her money back has gone up slightly. She will be less willing to lend or invest in the future; and the cost of credit will rise for all.

*Lifschultz*, 132 F.3d at 347. However, equitable subordination of the Series A Junior PIK Notes to the administrative tax claims is not *unpredictable*. In this case, the parties invented an artifice to gain an unfair advantage over the IRS and saw their opportunity to do so in the 1996 Bankruptcy Case. At the time they improved their position by obtaining a security interest, the Series A Holders were not "investors" because they did not provide value in return for the security interest.

The lien secured prior, unsecured, out-of-the-money debt.

Accordingly, I conclude that the Series A Holders engaged in inequitable conduct in obtaining a lien for their prior debt that enabled the Series A Holders to gain an unfair advantage and priority over another creditor. Namely, this misconduct harmed the IRS (and possibly other taxing authorities) designed to prevent them from collecting any capital gains tax. I also conclude that equitable subordination of the Series A Junior PIK Notes to the administrative tax claims is consistent with the distribution provisions of the Bankruptcy Code.

### (2) The Series B Junior PIK Noteholders

The Government argues that the claims of the Series B Junior PIK Noteholders (the "Series B Holders") also should be equitably subordinated to the administrative tax claims. The Indenture Trustee argues that the Government has not proven that any of the Series B Holders are insiders of Scott Cable or engaged in any misconduct. The Government argues that the facts support equitable subordination of *all* of the Junior PIK Notes, without regard to the inequitable conduct of individual holders. The Government also argues that facts demonstrate misconduct on behalf of the Series B Holders because the Creditors Committee, consisting mostly of Series B Holders, and their professionals knew about the tax avoidance scheme and negotiated to for "a piece of the action."

I first address whether the claims of the Series B Holders can be equitably subordinated without a showing of inequitable conduct by the Noteholders. The Government claims that the Series B Holders obtained the 15% interest in the Junior PIK Notes as successors-in-interest to the Series A Holders, whose claims should be

equitably subordinated. The Government also contends that the Series B Holders were not holders in due course for value, arguing that the Series B Holders provided no value for their interest in the Junior PIK Notes since they received 100% of their pre–1996 Bankruptcy Case claims on the effective date by receiving a cash payment and the Senior PIK Notes. Further, the Government claims that, by choosing not to intervene, the Series B Noteholders waived any affirmative defenses, such as proving that they had no actual knowledge of the scheme or holder in due course status.

 To equitably subordinate the Series B Holders' claims without a finding of inequitable conduct on their part would be to accept "no-fault" equitable subordination. In the past, the Third Circuit has held that creditor misconduct is not always a prerequisite for equitable subordination. *In re Burden v. United States*, 917 F.2d 115, 120 (3d Cir.1990). In that case, the court subordinated a tax penalty in the absence of government misconduct. *Sub-Micron*, 432 F.3d at 462 n. 16. In *United States v. Noland*, 517 U.S. 535, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996), the Supreme Court held that a subordinating a post-petition tax penalty claim "runs directly counter to Congress's policy judgment that a postpetition tax penalty should receive the priority of an administrative expense." *Id.*, 517 U.S. at 541, 116 S.Ct. at 1528. The *Nolan* Court, however, expressly reserved ruling on whether a bankruptcy court must always find creditor misconduct before a claim may be equitably subordinated. *Id.*, 517 U.S. at 543, 116 S.Ct. at 1528. More recent Third Circuit cases adopt the 3–prong test for equitable subordination, which requires inequitable conduct. *Winstar*, 554 F.3d at 411. *See also Moll Indus.*, 454 B.R. at 585 (reading *Winstar* as adopting inequitable conduct as a formal requirement for equitable sub-

ordination). Based on the foregoing, I conclude that if no fault equitable subordination can still be pursued in this Circuit, the circumstances allowing it would be extremely limited. I decline to adopt no fault equitable subordination in this case.

The Government further argues that the Series B Noteholders waived defenses by failing to intervene, constituting an attempt to reverse the burden of proof in this matter. As the moving party, the Government has the burden of coming forward with evidence to rebut the *prima facie* validity of the claim and, once the movant comes forward with material evidence of misconduct, the burden shifts to the claimant to demonstrate the fairness of his conduct. *Mid–American Waste*, 284 B.R. at 69. Accordingly, I will review whether the Government has come forward with evidence of misconduct of the Series B Holders.

(a) *Inequitable Conduct*

 The Government has not proven that the Series B Holders are "insiders" of Scott Cable. When equitable subordination claims are leveled against noninsider, non-fiduciary claimants, the level of pleading and proof and even higher. *ABF Capital Mgmt v. Kidder Peabody & Co. (In re Granite Partners, L.P.)*, 210 B.R. 508, 515 (Bankr.S.D.N.Y.1997). While equitable subordination can apply to an ordinary creditor, the circumstances supporting such a claim are few and far between. *Id.* Generally, a creditor may improve its position *vis-à-vis* another creditor provided he does not receive a preference or fraudulent transfer. *Granite Partners*, 210 B.R. at 515. Courts have described the type of inequitable conduct needed to equitably subordinate a non-insider creditor as "gross and egregious," "tantamount to fraud, misrepresentation, overreaching or spoliation," or "involving moral turpitude." *Id.*; *Sentinel Mgmt.*, 728 F.3d at 670.

 The Series B Holders obtained a share of the Junior PIK Notes through direct negotiations between the Creditors Committee and the 1993 Junior Noteholders. The Government claims that seven members were named to the Creditors Committee in the 1996 Bankruptcy Case: four of them were members of the pre-petition Informal Bondholders Committee, and one of the new members was Texas Commerce Bank, as Indenture Trustee for the Public Debenture Holders. The Government further contends that the Creditors Committee had knowledge of the scheme through the pre-petition presentation to the Informal Bondholders Committee by the Debtors' advisor, DLJ. Further, the Government argues that a memorandum to members of the Creditors Committee from their counsel noted the Committee's awareness of the plan to "leap-frog" over the capital gains taxes by stating: "the holders of the [1993 Junior Notes] want to preserve any upside potential and are unwilling to eliminate any of their debt because to do so will only transfer value to the taxing authorities." (Stip. Facts—Gov. ¶ 420.) The Government also argues that negotiating for a portion of the Junior PIK Notes was inequitable because it enabled Public Debenture Holders to receive more than 100% of their allowed claims in the 1996 Bankruptcy Case.

 I cannot impute any misconduct of individual Creditors Committee members to all of the Series B Holders. A leading commentator has noted that committees cannot bind their constituents, writing:

> Although committees are charged with negotiating the plan on behalf of their constituencies, the committees are not authorized or empowered to bind their constituencies. They are vested with considerable power and authority under the Code, but they are not the agents of and cannot bind the groups they represent. The plan will be submitted to creditors and to equity security holders for voting and those holders may or may not follow the committees' recommendations.

7 Collier On Bankruptcy ¶ 1103.05[1][d][i] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. rev.2014). Here, the Creditors Committee represented all unsecured creditors, not just the Public Debenture Holders. Their actions did not bind all unsecured creditors—or even individual Public Debenture Holders. Moreover, the parties concede that after the 1996 Bankruptcy Case, many of the Series B Junior PIK Notes were traded on the open market. The Government has not provided evidence of egregious misconduct by the individual Series B Holders. "[A]lthough it is a court of equity, [the Bankruptcy Court] is not free to adjust the legally valid claim of an innocent party who asserts the claim in good faith merely because the court perceives that the result is inequitable." Noland, 517 U.S. at 539, 116 S.Ct. at 1526. The record before me does not reveal whether the holders of the Series B Junior PIK Notes at the time of confirmation of the 1996 Plan are the same as the Series B Holders in the 1998 Bankruptcy Case. I conclude that the Government has not met its burden of proving gross and egregious misconduct by the Series B Holders.

## V. CONCLUSION

For the reasons set forth above, I conclude that (i) the Government's recharacterization claim is denied; and (ii) the Government's equitable subordination is granted with respect to the Series A Junior PIK Noteholders, and denied with respect to the Series B Junior PIK Noteholders.

An appropriate Order follows.